[Dkt. No. 21]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Crim. No. 20-613 (RMB) |
| v. | : | |
| | : | **OPINION** |
| AMITKUMAR KANUBHAI PATEL | : | |
| | : | |

There is a five-year old boy across the ocean, in Gujarat, India, asking his grandparents with whom he now lives why the United States took his father away from him over one and a half years ago. This Court has the same question.

I.   FACTUAL BACKGROUND

A.   May 2017 Order

The following facts are taken from the parties' submissions. On May 2, 2017, the Superior Court of the State of New Jersey, Chancery Division, Family Part ("State Court") entered an Order granting the boy's father, the defendant Amitkumar Kanubhai Patel ("Defendant"), "sole legal custody" (referred to herein as the "May 2017 Order") (Ex. B, Dkt. No. 21-2 at 11-14).[1] The May 2017 Order, signed and agreed to by both parents,

---

[1] Under New Jersey law, there are three ways to establish child custody:  "[j]oint custody of a minor child to both parents," "[s]ole custody to one parent with appropriate parenting time for the noncustodial parent," and "[a]ny other custody arrangement as the court may determine to be in the best interests of the child." Bisbing v. Bisbing, 230 N.J. 309, 321, 166 A.3d 1155, 1161 (2017) (quoting N.J.S.A. 9:2–4(a), (b), (c)). The parents' ability to agree is one of the factors family courts should take into account "to determine the custody arrangement that most effectively serves the child's best interests." Id. at 1162 (citing N.J.S.A. 9:2–4(c)).

allowed the mother, Poonamben Ambalal Patel ("Poonamben"), who was not married to Defendant, "to file for joint legal custody if she so chooses in the future" and provided for "parenting time as agreed by the parties." (Ex. B, Dkt. No. 21-2 at 11-14). The May 2017 Order did not establish any specific terms for Poonamben's parenting time (i.e., did not set forth any specific date(s) or time(s) on which Poonamben would be allowed to spend time with her child).

Prior to the May 2017 Order, Defendant and Poonamben had entered into a written Custody Agreement signed March 8, 2017 (the "Custody Agreement"), that provided, in part, that the father (the Defendant) was

> permitted to move anywhere both within and outside of the United States with [the son] without the mother's consent. . . . The parties acknowledge that due to their financial and other circumstances, this is the best decision for the welfare of [their son] as the Mother is not able to take care of [him].

(Ex. A, Dkt. No. 21-2 at 5, ¶¶ 3, 6.)

In July 2017, Defendant moved to India with his son.[2] (Defendant's Mem. Of Law in Supp. of Pre-Trial Motions ("Def's Mem."), Dkt. No. 21-1 at 4-5.) Defendant contends that Poonamben never wanted to be involved in their child's upbringing, but instead that it would be a burden on her and impair her ability to find a husband. (Def's Mem., Dkt. No. 21-1 at 4.)  Poonamben therefore agreed to let Defendant move with the child to India, to be raised by Defendant with assistance from his parents in a stable family environment.  (Id.

---

[2] N.J.S.A. 9:2-2 provides, in relevant part:

> When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State . . . they shall not be removed out of its jurisdiction . .. without the consent of both parents, unless the court, upon cause shown, shall otherwise order.

(emphasis added).

at 4.) Defendant further contends that Poonamben knew he was moving permanently to India with her permission because: a) she moved into Defendant's vacated apartment; b) she retained access to his furniture in storage; c) she had a transfer title form to Defendant's car that he had left for her; and d) she knew that when the lease expired, she would move in with her aunt. Finally, he claims that Poonamben helped him obtain a passport and visa and purchase one way airline tickets for their child. (Id.)

Defendant and his son remained with his family in India for more than a year, without hearing from Poonamben or any member of her family, including her parents who lived about 30 kilometers away from Defendant's village in India, according to Defendant. (Id. at 5.) The maternal family did not attempt to visit, make phone calls or send birthday cards or gifts at any time. (Id.) In those fourteen months, their son was cared for by Defendant and his parents, and he was enrolled in daycare and various sports and other activities. (Id. at 5.) In addition to not contacting Defendant to arrange for a visit with the child, for fourteen months Poonamben made no attempts to modify the May 2017 Order.

Defendant ascribes an ulterior motive on the part of Poonamben. He claims that she wants to stay in the United States and obtain citizenship. For this reason, Defendant asserts that the bogus kidnapping charges filed against him all are part of Poonamben's calculated scheme to obtain a U-Visa and stay in the United States. (Id. at 5.) [3]

---

[3] "Congress has authorized DHS to grant U-visas to noncitizen victims of serious crimes who cooperate with law enforcement and to the noncitizens' qualifying family members." Barrios Garcia v. U.S. Dep't of Homeland Sec., 14 F.4th 462, 468 (6th Cir. 2021), opinion amended and superseded on denial of reh'g, No. 21-1037, 2022 WL 402190 (6th Cir. Feb. 10, 2022) (citing 8 U.S.C. §§ 1103(a)(1), 1101(a)(15)(U); 8 C.F.R. § 214.14(a)(10)).

Poonamben tells a different story. She contends that Defendant wanted to take the child to India to see his parents and to obtain DNA testing, which was necessary for their child to claim property owned by Defendant's family in India. (Mem. of the United States in Opp. to Defendant's Pretrial Motions and in Supp. of its Motion for Reciprocal Discovery ("Government's Mem.") Dkt. No. 34 at 4-5.) Poonamben contends Defendant told her that he needed sole legal custody of the child to obtain a Visa for him, and they would need to go to court and assert it was their mutual agreement for Defendant to have sole legal custody. (Id. at 5.)

According to Poonamben, Defendant told her to tell the Family Court in 2017 that she did not have a work permit, was unemployed, and could not care for their son. (Id.) Poonamben claims several things: she was unrepresented at the Family Court hearing on May 1, 2017; the majority of the hearing was conducted in English without a translator; her English was very limited; and she answered the Court's questions in the manner Defendant had instructed her. (Id.) Poonamben maintains that Defendant told her the trip to India was only for two weeks. (Id.)

Poonamben further contends that she tried to contact Defendant using the phone app "WhatsApp" to learn if Defendant and the child had arrived in India safely but with no response. (Id.) Eventually, a friend of Poonamben's was able to contact Defendant, and he called Poonamben and said they were not returning to the United States. (Id. at 6.)

B. October 2018 Order

Fourteen months after Defendant moved to India with his son, on September 17, 2018, Poonamben petitioned the New Jersey Superior Court to "change custody to joint custody." (Ex. K, Dkt. No. 26-1 at 4, ¶ 3.) In her certification in support of her petition, she

stated that she had agreed to allow Defendant to take their son to India for one month to meet the rest of his family and that Defendant needed sole custody to get their son a Visa for travel. (Ex. L, Dkt. No. 26-2 at 5, ¶¶ 13, 15.) In describing the May 2, 2017 Family Court hearing, Poonamben said, in relevant part:

> [A court authorized staff member by the name of Brindasreevatsava] asked me if I understand that I am giving up all my rights once I give [Defendant] sole custody. I answered "yes I do." [] The Court member asked me when I was going to see my son[,] would it be every week or every month. The Plaintiff and I answered we have a mutual understanding.

(Ex. L, Dkt. No. 26-2 at 6, ¶¶ 17, 18.)

According to Defendant, from the time he left the United States, the first communication he received from Poonamben was in September 2018 in India. (Def's Mem., Dkt. No. 21-1 at 6.) Defendant received "some sort of documentation" scheduling a family court hearing in New Jersey. (Id.) It is unclear what documents were actually received by Defendant – all that he remembers is that he received some sort of summons and immediately contacted the Family Court in New Jersey on two occasions – September 19, 2018, and September 24, 2018. (Def's Mem., Dkt. No. 21-1 at 6.)

In those conversations (recorded by the Family Court, see transcripts at Exhibits D and E, Dkt. No. 21-3 at 1-18), Defendant asked the purpose of the hearing and what date it would be held. Defendant related to the Family Court representative that he and his son reside in India, that he had a Custody Agreement granting him sole legal custody, and there was a New Jersey Family Court Order dated May 2, 2017, also granting him sole custody. The Family Court representative told him they would go through the file and get back in contact with him. Defendant provided his current email address, physical mailing address

and telephone number in India. He also explained his position regarding custody and his intention to continue residing in India with his son.

According to Defendant, he did not hear from the Family Court again. (Def's Mem., Dkt. No. 21-1 at 6-7.) Concerned, he alleges, he filed an application for sole custody and "Permanent Injunction and Declaration under Civil Procedure Code 1908" in his local court in Sinor, India, in November 2018. (Id. at 7.) He wrote a detailed letter enclosing a copy of the petition on February 25, 2019, and the documents were mailed to the New Jersey Family Court, as well as Poonamben. (Id.) Counsel provided copies of these documents that bear the stamp "Received" by the New Jersey Family Court on March 7, 2019. (Exhibit F, Dkt. No. 21-3 at 21-34.)

Meantime, on October 16, 2018, the New Jersey State Court entered an Order that directed Defendant "to return the child to the United States immediately" (the "Return Order") but, importantly, the Return Order did not grant Poonamben's September 17 petition for visitation and custody. (Exhibit G, Dkt. No. 21-4 at 4.) According to the United States, Poonamben's counsel e-mailed the Return Order to Defendant on October 19, 2018. (Government's Mem., Dkt. No. 34 at 6.) Defendant appears to dispute that he ever received the Return Order.

C.  The Indictment

Over one year later, on September 27, 2019, the United States Attorney's Office for the District of New Jersey presented a Criminal Complaint against Defendant charging him with one count of a violation of 18 U.S.C. § 1204, commonly known as the International Parental Kidnapping Crime Act or "IPKCA", for his failure to comply with the Return Order when he allegedly received notice of it on October 19, 2018. (Government's Mem.,

Dkt. No. 34 at 7.) The Complaint was sworn out by an agent of the Federal Bureau of

Investigation. (Dkt. No. 1.) The Court, the Honorable Ann Marie Donio, United States

Magistrate Judge, issued a sealed warrant for the Defendant's arrest. (Dkt. No. 2.)

On July 22, 2020, a grand jury sitting in the District of New Jersey charged

Defendant in a one-count Indictment with a violation of 18 U.S.C. § 1204(a). The

Indictment alleges that the Defendant:

> from at least as early as October 19, 2018 [the Return Order] to the date of
> this Indictment, in the District of New Jersey and elsewhere, defendant
> Amitkumar Kanubhai Patel, did knowingly remove a child, namely AAP,
> from the United States and retained a child, AAP, who had been in the
> United States, outside the United States with intent to obstruct the lawful
> exercise of the parental rights of AAP's mother Individual 1.

(Dkt. No. 5 (emphasis added).)

D.  Defendant's Arrest

On October 2, 2020, Defendant was arrested in London on a provisional arrest

request submitted by the United States. (Government's Mem., Dkt. No. 34 at 7.)

Defendant maintains that he and his son were "lured into travelling to London . . . with the

promise of an all-expense paid vacation" by a "ruse concocted by the mother and her then-

boyfriend Tashar Patel (now husband, a former childhood friend of Defendant.)" (Def's

Mem., Dkt. No. 21-1 at 8-9.) As Defendant further elaborates, "[u]nfortunately, defendant

accepted the bait, and was arrested immediately upon landing, as the FBI had been

provided his exact flight itinerary by the mother and her boyfriend." (Def's Mem. Dkt. No.

21-1 at 8-9.)

Extradition proceedings were delayed when Poonamben filed a "without notice" application under the Hague Convention.[4] (Id. at 9.) As a result, Defendant Patel remained in the custody of the London authorities at the Wandsworth Prison,[5] and the child, now "a ward of the High Court of London,"[6] was placed in London's child custody services with a foster family. At no time did Poonamben travel to London. (Id.) Defendant contends that Poonamben never traveled to London because if she had left the United States, she would have been denied reentry due to her immigration status.[7] (Dkt. No. 21-1 at 5.) It is for this reason, as previously noted, he alleges that Poonamben has fabricated the kidnapping charge to allow her to live legally in the United States with a U-Visa, that is, falsifying that she was a victim of a domestic crime.  (Id.)

After the child was placed with a foster family in London, it would be another six months before he would go back home to India[8] - - without his father - - to be with his

_____

[4] Because the United Kingdom is a signatory of the 1980 Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention"), Poonamben filed two civil applications in the High Court Family Division seeking an order for [child's] return to her in the United States of America. Poonamben's applications were (i) the Hague Convention also given effect under the Child Abduction and Custody Act 1985; alternatively (ii) pursuant to the inherent jurisdiction of the High Court of England and Wales. (Government's Mem., Dkt. No. 35 at 7, n.4.)

[5] Exhibit J, Dkt. No. 21-5, ¶ 6.

[6] Exhibit J, Dkt. No. 21-5, ¶ 17.

[7] According to the Government, Poonamben illegally entered the United States in late 2014 or early 2015. Poonamben flew from Ahmadabad, India, to Dubai, United Arab Emirates, to Panama City, Panama. From Panama, Poonamben walked through Guatemala into Mexico and sought asylum in Hidalgo, Texas. (Government's Mem. Dkt. No. 34 at 1, n. 3.)

[8] The High Court of Justice Family Division in London found it was in the child's best interests to return to India "to the care of his grandparents until his father can join him. It is

grandparents. (Def's Mem., Dkt. No. 21-1 at 9.) Before the High Court of Justice Family Division in London ruled, and while Defendant was in custody in London, Poonamben filed another petition before the State Court seeking custody of her son. (Ex. I, Dkt. No. 21-4 at 11.) In rendering its ruling, the State Court noted, "[i]t is not clear why Defendant has now petitioned two (2) different courts in two (2) different countries." (Id. at 12, ¶ 23.) "Regardless," in its March 24, 2021 order, the State Court ruled, "this [c]ourt declines to permanently modify the custody and parenting time in the May 1, 2017, Order as [Poonamben] fails to demonstrate that such arrangement is in the child's best interest." (Ex. I, Dkt. No. 21-4 at 12, ¶ 23 (emphasis added)). The State Court, however, - now advised of Defendant's arrest - this time granted temporary, physical custody "to ensure return of the child to Defendant until such time as both parties can appear before the court to address custody and parenting time on a prospective basis." (Id.) (emphasis added).

The court in London held an extensive five-day hearing and made detailed findings, some of which this Court refers to below. In part, the High Court of Justice Family Division found that Poonamben was "deliberately lying" and that her "deliberate lies ran throughout her evidence and appeared to be a deliberate attempt to support a case on abduction, most probably with a view to improving her prospects of securing a green card and also enabling her to have [their son] in the USA." (Ex. J., Dkt. No. 21-5 at 31,t ¶ 83.) See, supra n. 7. The High Court also held in its March 26, 2021 ruling:

> I find that in their discussions prior to the custody agreement, the custody
> order and the departure of [their child] to India on 27 July 2017 the mother

---

also in his best interest that video contact with the mother continues and that he spends time with her if she goes to India." (Ex. J., Dkt. No. 21-5, ¶ 111.)

had agreed that the father should be granted sole custody over [their child] because she had agreed that the father should take full responsibility for [their child] and he could take him to India permanently and care for him there. The mother agreed to the custody agreement and custody order as a means to enable the father to obtain a visa to take [the child] to India permanently. She was fully aware of the contents of the custody agreement which were read out to her in Gujarati by Ms Toral Parekh, a New Jersey lawyer. Her agreement to [their child's] departure and the custody order was not induced by the father falsely assuring her that he was only going for a month for a holiday or for the purpose of a DNA test. The mother knew and agreed that the father and [the child] were moving permanently. The agreement arose from the parents' decision to separate and live their own lives, in circumstances where the father was unwilling to marry the mother.

(Ex. J, Dkt. No. 21-5 at 30, ¶ 82.)

In the end, the High Court of Justice Family Division denied Poonamben's Hague Convention application for her son to return to the United States, holding that it was the boy's "best interest that he be returned to India to the care of his grandparents until his father can join him."[9] (Id. at 39, ¶ 111.)

Defendant Patel, however, would not return to India. The United States sought and was granted his extradition, which was effected on September 9, 2021. (Government's Mem., Dkt. No. 34 at 8.) On September 10, 2021, he appeared before this Court, the Honorable Karen M. Williams, United States Magistrate Judge, and was detained. See Minute Entry, Dkt. No. 10; Order of Detention, Dkt. No. 15. On December 23, 2021, Defendant filed an Emergent Motion for Release. (Dkt. No. 22.) On February 4, 2022, this Court held a hearing – which had been delayed due to Defendant's mandatory COVID quarantine in prison – via video conference. (Minute Entry, Dkt. No. 36.)  Upon hearing the evidence and arguments, the Court ordered Defendant's immediate release with certain

---

[9] The Court also ruled "It is also in his best interest that video contact with the mother continues and that he spends time with her if she goes to India."  Id.

conditions in place to ensure his appearance. (Order Setting Conditions of Release, Dkt. No. 38.) As a result of the significant efforts of his counsel, Defendant was placed in the custody of Joseph Walker, whom this Court was advised was the father of Defendant's one-time cellmate in FDC Philadelphia, another former client of his counsel. Walker agreed to serve as a third-party custodian and accept Defendant into his home in New Jersey pending trial. Defendant was ordered to have no contact with Poonamben, to surrender his passport, and the order subjected him to home detention and supervision by the Office of the United States Pretrial Services. (Id.)

II.    ANALYSIS

Defendant has now filed a Motion to Dismiss the Indictment for two main reasons: (1) pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) or, alternatively, (2) because it is void for vagueness as applied to the Defendant. [10]

A. Motion to Dismiss: F.R.C.P. 12(b)(3)(B)(v)

Under Rule 12(b)(3)(B)(v), Defendant first argues that the facts alleged in the Indictment fail to state an international kidnapping crime under Section 1204 because a violation of the Return Order, as alleged, falls outside the scope of 18 U.S.C. § 1204.[11]

---

[10] Defendant asserts several arguments related to the lack of State Court jurisdiction and the Hague Convention. Because this Court concludes that dismissal of the Indictment is warranted under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for several reasons, it does not address Defendant's other jurisdictional arguments.

[11] (Mem. Of Law in Supp. of Emergent Mot. for Release on Bail Conditions, Dkt. No. 22-1 at 5.)

Second, Defendant argues that as a matter of law, the Government is incapable of proving beyond a reasonable doubt the element of obstructing Poonamben's "parental rights."; the undisputed extrinsic evidence demonstrates that Defendant's conduct "[falls] squarely within the provisions of a valid family court order, dated May 1, 2017, granting defendant 'sole legal custody of the minor child'" and the parties were to agree as to parenting time. (Def's Mem., Dkt. No. 21-1 at 19.)

The United States opposes this motion, arguing that "the Indictment tracks the language of the statute, and it pleads facts that, if proven at trial, would violate the statute." (Government's Mem., Dkt. No. 34 at 6 (emphasis added).) The Government also argues that what Defendant is really arguing, is his affirmative defense under 18 U.S.C. § 1204(c). (Id. at 11.) The validity of his affirmative defense, however, is not properly resolved through a motion to dismiss because, "it is intertwined with hotly contested fact issues concerning defendant's intent at the time he [retained] the child[] [in] India." (Government's Mem., Dkt. No. 34 at 9, citing United States v. Fazal, 203 F.Supp.2d 33, 35 (D. Mass. 2002) (citing United States v. Russell, 919 F.2d 795, 797 (1st Cir. 1990)).

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) permits a defendant to move to dismiss an indictment for failure "to state an offense." Thus, a district court must find that "a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *Cf.* United States v. Panarella, 277 F.3d 678, 685 (3d Cir. 2002*), abrogated*

on other grounds by United States v. Wright, 665 F.3dd 560 (3d Cir. 2012);[12] United States

v. Huet, 665 F.3d 588, 595 (3d Cir. 2012) (same). This Rule "allows a district court to

review the sufficiency of the government's pleadings to … ensure that legally deficient

charges do not go to a jury." Huet, supra (quoting Bergrin, 650 F.3d at 268.)

Rule 12(b)(3)(B)(v) also permits any pretrial motion regarding a defense that is

capable of determination without trial. United States v. Levin, 973 F.2d 463, 467 (6th Cir.

1992). A defense is capable of determination "if trial of the facts surrounding the commission

of the offense would be of no assistance in determining the validity of the defense." United

States v. Covington, 395 U.S. 57, 60 (1969). Indeed, as the Levin Court held, Rule 12

"encourage[s] district courts to entertain and dispose of pretrial criminal motions if they are

capable of determination without trial of the general issues." 973 F.2d at 467; see also

United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986) (quoting

U.S. v. Jones, 542 F.2d 661, 664 (6th Cir. 1976) (footnote omitted) ("a district court may

make finding of fact necessary to decide the questions of law presented by pretrial motions

so long as the court's findings do not invade the province of the jury.")

---

[12] The prong of Federal Rule of Criminal Procedure at issue in Panarella was then prong
12(b)(2), "which provides that 'objections . . . that [the indictment or information fails to
charge an offense . . . shall be noticed by the court at any time during the pendency of the
proceedings." Panarella, 277 F.3d at 680. The Court acknowledges that in April 2014, the
Supreme Court approved amendments to Rule 12 that reorganizes and revises the
requirements for pretrial motions and moved the relevant prong at issue in Panarella to
subsection (b)(3), specifying that a motion regarding an alleged defect in an indictment must
be made before trial. Fed. R. Crim. P. 12. Such amended procedural requirement is not an
issue in the present case.

The Court begins its analysis with Federal Rule of Criminal Procedure 7(c)(1) as the Government urges it to do. According to this rule, an indictment must contain only a "plain, concise and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). An indictment is sufficient so long as it

> (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution. Moreover, no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.

United States v. Kemp, 500 F.3d 257, 280 (3d Cir. 2007) (rejecting multiple challenges to the sufficiency of an indictment charging honest services fraud) (internal citations omitted); accord Hamling v. United States, 418 U.S. 87, 117 (1974) (similar standard under Constitutional requirements); United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989) (same). As the Supreme Court explained:

> [T]he Federal Rules were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure. While detailed allegations might well have been required under common law pleading rules, they surely are not contemplated by [Federal Rule of Criminal Procedure] 7(c)(1).

United States v. Resendiz-Ponce, 127 S. Ct. 782, 789 (2007) (citations and internal quotation marks omitted).

The Government is correct that the Indictment tracks the statutory language of Section 1204. This satisfies Rule 7(c)(1)'s requirement of a "plain, concise and definite written statement of the essential facts constituting the offense charged." That is not the end of the inquiry, however. Here, as the Government acknowledges, the facts plead in the indictment that form the basis for the offense must violate the statute. The Indictment alleges that Defendant violated 18 U.S.C. § 1204(a) when he failed to obey the Return

Order. The Return Order provided:

> Per Order dated 05/01/2017, [Defendant] was granted sole custody of the minor child . . . [Poonamben] applied through her attorney . . . . . . . . . Per [Poonamben], [Defendant] took the minor child to India on 07/26/2017. [Poonamben] agreed to [Defendant] taking the minor child for two weeks of vacation. [Defendant] has not returned the minor child to the United States. Per [Poonamben] she called the [Defendant] when he reached India. [Defendant] has not brought the minor child to the United States since July of 2017. When [Poonamben] called the [Defendant] as to when he would return the child and for child's wellbeing, [Defendant] informed [Poonamben] he was not bringing the child back to the United States. [Defendant] to return the child to United States immediately.

(Ex. G, Dkt. No. 21-4 at 4.) Thus, Defendant's motion raises this question of law: by failing to comply with the Return Order as alleged in the Indictment, did Defendant obstruct Poonamben's lawful exercise of her "parental rights" as that term is defined within the meaning of the statute? Because the Indictment challenges a violation of the Return Order, and the Return Order does not establish Poonamben's parenting time, see infra, the Court agrees with Defendant that the conduct with which Defendant is charged is outside the scope of the criminal statute, 18 U.S.C. § 1204.

The Defendant's motion also raises this question of law: is the Government legally unable to prove based on the undisputed extrinsic evidence obstruction of parental rights, which is an integral element of 18 U.S.C. § 1204? To answer this question, the Court turns to the statutory language.

B. 18 U.S.C. § 1204

18 U.S.C. § 1204 provides:

(a) Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both.

18 U.S.C. § 1204 (emphasis added).

(b) As used in this section –

    (1)    the term "parental rights" . . . means the right to physical custody of

the child -

        (A) Whether joint or sole (and includes visiting rights); and
        (B) Whether arising by operation of law, court order, or legally binding
            agreement of the parties.

18 U.S.C. § 1204(b). In New Jersey, by operation of law,

> there are three options available for child custody: "[j]oint
> custody of a minor child to both parents," "[s]ole custody to
> one parent with appropriate parenting time for the noncustodial
> parent," and "[a]ny other custody arrangement as the court
> may determine to be in the best interests of the child.

See, supra n. 1.

Thus, as the plain meaning of the statute provides, in order for a parent to have

"parental rights" within the meaning of the statute (that the other can be criminally charged

with obstructing) he or she must first have either joint custody, sole custody or visiting

rights. See, United States v. Alahmad, 28 F.Supp.2d 1273, 1274 (D. Col. 1998) ("The three

"parental rights" that trigger criminal liability under IPKCA are joint custody, sole custody,

and visiting rights.") Under New Jersey law, visiting rights are called parenting time.[13]

Visiting rights (synonymous with "parenting time" here) must derive from either operation of

the law, "court order," or a "legally binding agreement of the parties." 18 U.S.C. §

1204(b)(2)(B).

---

[13] See e.g., Levine v. Bacon, 152 N.J. 436, 440, 705 A.2d 1204, 1206 (1998) (noting that the
burden of proving that a parenting time schedule would be too burdensome is on the
noncustodial parent.)

Because the Indictment does not allege that Poonamben had joint custody, or sole custody (nor could it given the undisputed evidence, see infra), the Court focuses its analysis on the remaining parental rights that trigger criminal liability under the statute: "visiting rights" (or "parenting time" here). The Return Order states explicitly that Defendant was awarded sole custody of the child. Under New Jersey law, when a parent has sole custody, the other non-custodial parent has "appropriate parenting time." (See, *supra*, n.1.) The Return Order did not alter the May 2017 Order.[14]

Thus, this all begs the question, how does "parenting time" as agreed by the parties" fit within the § 1204 statute such that a criminally charged parent can be found to have obstructed the other parent's parenting time? From this Court's analysis, there is no definition of "visiting rights" under the statute. For the reasons that follow, this Court holds that under IPKCA, the term "visiting rights" must mean those rights that are concrete and specifically defined in a court order or a legally binding agreement between the parents established prior to the initial act of unlawful removal or retention that has continued. To put it differently, such court order or legally binding agreement must set forth a specific date(s) and/or time(s) during which such parenting time will occur (i.e., some physical component or specified time to be spent with the child). Any other construction would lead to absurd and unjust results.

The following examples illustrate this point and each example assumes the child was lawfully removed outside the United States. For example, if one parent has

---

[14] The Return Order did not do what the March 2021 Order did, give Poonamben temporary custody until the Court could resolve the dispute.

sole custody and the other parent has visiting rights, and those visiting rights are "unspecified" or merely defined as whatever (parenting time) the parties agree to, does that mean that a parent who has chosen not to see the child for ten years can later have a change of heart, assert her or his visiting rights, and file international kidnapping charges if the custodial parent declines or even disagrees? This Court thinks not. If a parent with only unspecified visiting rights goes to the FBI saying the parents had a verbal agreement (parenting time) as to an upcoming two-week vacation, for example, and the sole custodial parent reneges and does not return to the United States, can the parent with only unspecified visiting rights press a charge of kidnapping without any formalization of the visiting rights agreed to by the parents by order or legally binding agreement? This Court thinks not. Can a parent with unspecified visiting rights only, who consents to the sole custodial parent living in another country later seek modification of the custody order to permit weekend visitation time then file international kidnapping charges before the custody order is legally modified? This Court thinks not. What if a family court grants sole legal and physical custody to one parent, having been told the parties later will agree on visiting rights, and the custodial parent leaves the country by consent on vacation the next day without agreeing on the visitation rights? Is that international kidnapping?  How long do the parties have to agree on visiting rights? Finally, what if the custodial parent with sole custody has legitimate reasons for not allowing parenting time to the non-custodial parent.[15] Does that parent subject himself to international kidnapping charges for exercising that discretion?

---

[15] Under New Jersey law, "legal custody" means the "authority and responsibility for making 'major' decisions regarding the child's welfare[.]" Pascale v. Pascale, 140 N.J. 583, 596, 660 A.2d 485, 491 (1995) (quoting Beck v. Beck, 86 N.J. 480, 487, 432 A.2d 63 (1981).

In all of these examples, due process requires more. The visiting rights must be clearly and with certainty spelled out (in a family court order or legally binding agreement as required by § 1204). The foregoing parade of horribles illustrates why this is so, so that the party accused of obstructing the lawful exercise of another's parental rights can understand exactly what conduct is prohibited that subjects him to criminal penalties. Due process requires no less, see Kolender v. Lawson, 461 U.S. 352, 357 (1983) (due process requires that a "statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited"), and anything less criminalizes a parent's failure to come to a parenting time agreement. See also Levin, supra, 973 F.2d at 467 (quoting Raley v. State of Ohio, 360 U.S. 423, 438-39 (1959) (citation omitted)("criminal

sanctions are not supportable if they are to be imposed under 'vague and undefined' commands").

With this statutory interpretation, this Court holds first, that the Indictment is legally deficient. Importantly, the Indictment does not charge Defendant with unlawfully removing the child in July 2017.[16] Rather, the Indictment charges that Defendant violated 18 U.S.C. § 1204 by failing to comply with the Return Order. Yet in looking at the Return Order, it did not grant to Poonamben any of three parental rights that trigger criminal liability under § 1204, and there is no allegation in the Indictment that alleges Poonamben had specific

---

[16] The United States does not dispute that Poonamben permitted Defendant and his son to travel to India. They dispute that Poonamben agreed to their living in India. Moreover, Defendant contends that the Government can present no evidence that will show that

visiting rights within the meaning of the statute, as interpreted by this Court. The Return

Order simply ordered Defendant to return the child to the United States. Thus, although the

Indictment may charge the Defendant's failure to appear, the Indictment fails to state a

criminal offense under 18 U.S.C. § 1204.

Alternatively, even looking beyond the face of the Indictment, the undisputed extrinsic

evidence in the record (which this Court does not need to address) provides an alternative

independent basis for the dismissal of the indictment as Defendant urges, and confirms that

as a matter of law, the Government cannot prove an essential element of the alleged crime

(i.e., that Defendant acted with intent to obstruct Poonamben's parental rights or her

"parenting time" as this Court has interpreted it). The record before this Court demonstrates

that Defendant was granted sole legal custody per the May 1, 2017 Order ("By consent of

parties, Plaintiff is granted sole legal custody of the minor child….") (Ex. B, Dkt. No. 21-2 at

14.) The Order also gave "parenting time as agreed by the parties." (Id.) The May 2017

Order provided no specific directions other than "as agreed by the parties." The Custody

Agreement further provided that Defendant was permitted to move with his son outside of

the United States and was silent as to parenting time. (Ex. A, Dkt. No. 21-2 at 1-9.) The

record shows that when Poonamben petitioned the Court for a modification of the May 2017

Order for visitation and custody rights, neither was granted in the Return Order. To be sure,

the Return Order directed Defendant's return to this country but it did <u>not</u> alter what had

been in place – under the May 2017 Order - the mother did not have custody (either sole or

joint) and any visiting rights were limited to those "as agreed to by the parents." (Ex. G, Dkt.

No. 21-4 at 4.)

But, as this Court has determined, just having an "agreement" to agree as to

parenting time is not sufficient; the agreement must be "legally binding" or established by a

Court order with specificity. What the United States has charged Defendant with here is merely failing to agree with Poonamben as to their parenting time.[17] This is hardly a violation of § 1204. If parents who are unable to agree as to visiting rights can take their domestic squabbles to the FBI, the FBI will be forced to take sides and determine which parent is credible and which is subject to international kidnapping charges, as occurred here. Then federal courts become family courts, with juries deciding which parent is telling the truth. There is a court for couples' contretemps. It is not this Court nor is the role of the FBI.

To be clear, there is nothing that prohibits a state court from entering "as agreed to by the parties" parenting time orders. Indeed, Family Court judges possess the specialized knowledge, experience and judgment to make these often times very difficult decisions.[18] It is an unenviable but invaluable role they play, not only in our judicial system, but to families. Moreover, such agreements further the goal of limiting courts' intervention into familial affairs. Parents need flexibility in their everyday lives to tend to their children's needs. But such agreements cannot serve as the fulcrum for IKPCA kidnapping charges or, even worse, to send a parent to federal prison.

The Court notes that at the hearing on Defendant's emergent application for bail, the Government took the position that Poonamben had a right to physical custody of the child

---

[17] Defendant contends that Poonamben was free to visit her son in India. The Court need not address this issue.

[18] See New Jersey Div. of Youth and Family Services v. F.M., 211 N.J. 420, 48 A.3d 1075, 1078 (2012), stating "we invest the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the bests interests of the child."

because her parental rights had not been terminated.[19] The Government's argument is fatally circuitous: Poonamben had parental rights because her parental rights were not terminated. The statute requires more: custody or defined parenting rights. Moreover, the Government appears to claim that Poonamben had "parental rights" because the May 2017 Order gave her the right "to file for joint legal custody" in the future. The right to file for physical custody rights in the future falls nowhere within the statute.

Finally, the Government also argues in its papers and at the bail hearing that Poonamben was coerced into signing the Custody Agreement. Putting aside the undisputed fact that the High Court of Justice Family Division in London found the Agreement was knowingly and intelligently entered into by the parties with the assistance of an interpreter and a court management officer, see Exhibit J at 21-5 at 30-31, ¶ 82, the Government's claim does not save its case. It is an argument that is immaterial to the Court's resolution of the statutory meaning of parental rights. First, the Indictment does not allege that Defendant's removal of the child from the United States was unlawful, apparently a concession to the validity of their Custody Agreement that Defendant could move anywhere.[20] Second, the Government's charge of unlawful retention does not arise from the Custody Agreement but from the Return Order. Third, Poonamben's remedy is with the state court to undo the Custody Agreement, not to put the federal court in the middle of a custody dispute.

---

[19] In New Jersey, termination of parental rights is governed by N.J.S.A. § 30:4C-15.1. It is undisputed that Poonamben's parental rights were not terminated.

[20] New Jersey law "states that even after custody is determined in a divorce proceeding, the unilateral removal of a child by a custodial parent without the other parent's consent or a court order is forbidden. Carrascosa v. McGuire, 520 F.3d 249, 256 (3d Cir. 2008) (citing N.J.S.A. 9:2–2.

In this Court's final analysis, the Indictment fails to establish each element under §
1204, within the statutory meaning of the terms used in the statute, and the undisputed
evidence demonstrates that, as a matter of law, the Government cannot prove that that
Defendant violated § 1204 with intent to obstruct the "lawful exercise of the parental rights
of AAP's mother."[21] See e.g., United States v. Schiff, 602 F.3d 152, 162–66 (3d Cir. 2010)
(finding that indictment alleging "failure to rectify misstatements of others" did not, as a
matter of statutory interpretation, state an offense under 15 U.S.C. § 78j(b) and SEC Rule
10b–5);

   C.   Motion to Dismiss: Void for Vagueness

Lastly, Defendant moves to dismiss the Indictment on the grounds that the § 1204
statute is void for vagueness as applied to him. (Def's Suppl. Mem. of Law in Supp. of Pre-
Trial Motions, Dkt. No. 26.) Because the Court grants Defendant's Rule 12(b)(3) Motion, it
need not address this argument.

---

[21] At oral argument at the emergency bail hearing, counsel for the United States asserted that
"to this day Defendant is continuing to violate the statute" and "this can easily be resolved if
he turns over the child." (Minute Entry, Dkt. No. 36.) Any attempt by the Government to
argue that Defendant is in violation of 18 U.S.C. § 1204 because he has unlawfully retained
the child in contravention of the state court's temporary custody order of March 24, 2021 [Ex.
I, Dkt. No. 21-4 at 12] giving Poonamben "temporary legal and physical custody of the child
pending further Order of the Court," cannot be taken seriously. Defendant has been in jail
since the Government arrested him and was in jail at the time the court order was entered.
The Government, by its own conduct, caused the "retention" and to turn around and charge
Defendant with unlawful retention – international kidnapping - is unconscionable. As this
Court previously acknowledged, the Levin Court explained that "criminal sanctions are not
supportable if they are to be imposed under 'vague and undefined commands,' *and certainly not
if the Government's conduct constitutes 'active misleading*.'" Levin, 973 F.2d at 467 (emphasis in
original) (citations omitted).

III.      CONCLUSION

    For the reasons set forth above, the Court holds that, as a matter of law, the

Indictment fails to state an offense under 18 U.S.C. § 1204 and the Government cannot

prove Defendant violated the mother's "parental rights" (parenting time) because the State

Court gave no specific commands on which Defendant could understand that his conduct

would subject him to criminal penalties. At most, the Government can show that the

parties had a disagreement surrounding Poonamben's visiting rights.

    As an exercise of caution, however, because this Court has not conducted a hearing

on Defendant's Motion to Dismiss the Indictment under Federal Rule of Criminal

Procedure 12(b)(3)(B)(v), the Court will afford the Government an opportunity to respond

to this Court's Opinion. The response shall answer the following questions: are the facts as

set forth above undisputed? If not, what resolution of material facts, if any, are necessary to

resolve the issue of "parental rights" other than those the Court has relied upon. The Court

is keenly mindful of the fact that it shall not weigh the evidence – that is for a jury to do.

Based on the undisputed evidence placed before this Court (unless there is other evidence of

which this Court is not aware and the Government will so advise) the United States has

failed, as a matter of law, to prove an essential element of 18 U.S.C. § 1204.

    The Government shall file its response within ten days. If no response is submitted,

the Court will enter an order dismissing the Indictment. An appropriate Order shall issue.


                              s/ Renée Marie Bumb
                              RENÉE MARIE BUMB
                              United States District Judge


Dated: February 18, 2022