[Dkt. No. 116]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,    :
    :
    :    Crim. No. 20-613 (RMB)
    :
v.    :    **OPINION**
    :
    :
    :
AMITKUMAR KANUBHAI PATEL    :

Appearances:
Andrew Carey, AUSA
Jason M. Richardson, AUSA
Office of the United States Attorney
401 Market Street, 4th Floor
Camden, New Jersey 08101

       Attorneys for the Government

Lori M. Koch, AFPD
Christopher H. O'Malley, AFPD
Office of the Federal Public Defender
800-840 Cooper Street, Suite 350
Camden, New Jersey 08102

       Attorneys for the Defendant

**Bumb, U.S. District Judge:**

       After a five-day trial before this Court, a jury found the defendant, Amitkumar

Kanubhai Patel (the "Defendant"), guilty of kidnapping his child – for whom he had sole

legal custody – in violation of the International Parental Kidnapping Act ("IPKA"), Title 18

of the United States Code, Section 1204.  Defendant now asks this Court to enter a

judgment of acquittal, or alternatively, to vacate his conviction and order a new trial because a miscarriage of justice occurred.

This case presents some very troubling facts.  First, the Government prosecuted this criminal case as if it were a civil child custody dispute before the New Jersey family court that issued the initial sole custody order.  Second, the Government ignored the record that revealed significant due process concerns about the jurisdiction of the family court to enter the order that served as the basis for the criminal charge (as well as subsequent orders) in the Indictment.  Third, the Government turned a blind eye to the findings of The Hague Abduction Convention court in London (the "Hague Court") that found – after a full evidentiary hearing – that the mother had consented to Defendant's permanent removal of the child from the United States to India and that the child should **not** be returned to the United States to be with the mother because of the serious risks posed to the child's welfare. Specifically, the Hague Court found that the mother had "deliberately lied" and likely filed false abduction charges against Defendant to improve her immigration status in the United States.  In a sense, then, the Government sought a "redo" of the Hague Court's ruling before this jury.  For the reasons set forth below, the Court agrees with Defendant:  a miscarriage of justice occurred; the Government injected numerous prejudicial errors into the trial, including impermissible constructive amendments of the Indictment.  Therefore, the conviction will be vacated.[1]

---

[1] The Court received a letter from Defendant [Dkt. No. 130], advising that the Family Court recently issued an order [Dkt. No. 130-1], upon the mother's application, directing that Defendant – currently on bail pursuant to this Court's order – return his son to the United States by December 18, 2022, and that the failure to do so "will result in a bench warrant for [Defendant's] arrest." [Id.] Defendant contends that this recent order, as well as an earlier order dated March 24, 2021 (discussed below), were not entered in accordance with New Jersey family law. It is not at all clear to this Court that the Family Court has jurisdiction to

## FACTUAL AND PROCEDURAL BACKGROUND

The following is a summary of how the record unfolded, including the Government's ever-changing "nature of the charges" brought against Defendant in the Indictment.

### A.    The Indictment

On June 22, 2020, a grand jury sitting in Camden, New Jersey for the District of New Jersey (the "Grand Jury"), returned a one-count Indictment charging Defendant with a violation of the IPKA, codified at 18 U.S.C. § 1204 (the "Indictment").  The Indictment is set forth in full below:

### INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Camden, charges:

1.  At all times relevant to this Indictment:

---

enter this recent order. Indeed, it appears that under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), codified at N.J. Stat. Ann. 2A:34-53, it does not. The UCCJEA sets forth when the initial family court has continuing jurisdiction in an international custody conflict. Pursuant to Section 2A:34-66, the court has exclusive, continuing jurisdiction until:

> (1) a court … determines that neither the child, the child and one parent, nor the child and a person acting as a parent have a significant connection with [New Jersey] and that substantial evidence is no longer available in [New Jersey] concerning the child's care, protection, training, and personal relationships; or

> (2) a court of [New Jersey] or a court of another state determines that neither the child, nor a parent, nor any person acting as a parent presently resides in [New Jersey].

Because the trial evidence established that AAP has lived in India since 2017 and the mother, Poonamben Patel, moved to New York years ago, it seems clear that the Family Court no longer has jurisdiction. Moreover, the recent Family Court order contradicts the Hague Court's detailed factual findings and ruling (discussed below) that the child should not be returned to the mother in the United States. Clearly, the interplay between the UCCJEA and The Hague Abduction Convention warrants important consideration, as fundamental principles of fairness dictate that Defendant cannot be compelled to abide by two conflicting court orders.

a. Defendant AMITKUMAR KANUBHAI PATEL was born in India and became a naturalized citizen of the United States on May 29, 2013.

b. In November 2016, minor [known as AAP] was born at JFK Medical Center in Edison Township, New Jersey. AAP is a United States citizen. AAP's biological mother was Individual 1 and his biological father was defendant AMITKUMAR KANUBHAI PATEL.

c. The term "child" means a person who has not attained the age of 16 years pursuant to Title 18, United States Code, Section 1204(b)(l).

d. The term "parental rights," with respect to a child, means the right to physical custody of the child - (A) whether joint or sole (and includes visiting rights); and, (B) whether arising by operation of law, court order, or legally binding agreement of the parties, as defined by Title 18, United States Code, Section 1204(b)(2).

2.  On or about July 26, 2017, defendant AMITKUMAR KANUBHAI PATEL and AAP boarded Qatar Airways Flight #702 from John F. Kennedy International airport in New York to Doha International airport in Doha, Qatar.

3.  On or about October 16, 2018, the New Jersey Superior Court Chancery Division Family Part ordered defendant AMITKUMAR KANUBHAI PATEL to return AAP to the United States immediately.

4.  From at least as early as October 19, 2018 to the date of this Indictment, in the District of New Jersey and elsewhere, defendant

AMITKUMAR KANUBHAI PATEL

did knowingly remove a child, namely AAP, from the United States and retained a child, AAP, who had been in the United States, outside the United State's with intent to obstruct the lawful exercise of the parental rights of AAP's mother, Individual 1.

In violation of Title 18, United States Code, Section 1204(a) and Title 18, United States Code, Section 2.

[Dkt. No. 5.]

4

At Defendant's initial bail hearing, this Court was clearly troubled that the Indictment, as charged before the Grand Jury, was legally deficient.  But as detailed herein, the Government's factual bases for the crime see-sawed and fitting those facts within the elements of Section 1204 became a tremendous challenge for the Court and the defense, to say the least.

### B.   The Bail Hearing

At the emergency bail hearing on February 4, 2022, the Government first explained to this Court its factual basis for charging Defendant with a violation of Section 1204. According to the Government, Defendant's failure to obey the order of the New Jersey Superior Court—Chancery Division, Family Part (the "Family Court"), dated October 16, 2018, to return AAP to the United States immediately (the "October 2018 Return Order"), constituted a violation.  However, predating the October 2018 Return Order by approximately seventeen months was another order from the Family Court.  On May 2, 2017, the Family Court entered an order that gave sole legal custody to Defendant (the "May 2017 Custody Order") set forth below:

> It is further ORDERED: By consent of the parties, [Defendant] is granted sole legal custody of minor child, AAP.  Parenting time as agreed by the parties. [Poonamben Patel] is allowed to file for joint legal custody if she so chooses in future.  Parties consented to this Order.

[Gov't. Ex. 1.]

When pressed by the Court as to how the October 2018 Return Order created "parental rights" for AAP's biological mother, Poonamben Patel — an essential element of Section 1204 — in light of the May 2017 Custody Order, which granted Defendant sole legal custody and parenting time for Poonamben Patel only insofar "as agreed by the parties," the Government gave several explanations.  First, the Government argued that the

5

crime is ongoing:

> As we sit here today, the defendant is committing a federal crime.  The child is in India.  If perhaps he was returned, we might be in a different spot.  The defendant is not following that valid court order [the October 2018 Return Order], **is in contempt presently**.  He has not complied with the order.

[Dkt. No. 47, at 10-11 (emphasis added).]

Later in the bail hearing, the Government pivoted to attacking the May 2017

Custody Order, explaining that "it's the [G]overnment's position that the mother was

defrauded into the [May 2017 Custody Order] being issued."  [Id. at 14.]  The Court quickly

pointed out:

> That might be a different issue.  That might be a different issue.  But I don't see the government making the case that Mr. Patel has kidnapped the child because he criminally defrauded the mother.  I don't see that.
>
> •  •  •
>
> And from everything I've read, the government's case hinges on the fact that he failed to abide by the court's order for him to appear.
>
> •  •  •
>
> GOVERNMENT:  Yes, Your Honor.
>
> THE COURT:  To my way of thinking, that sounds like a failure to appear violation, not kidnapping.  I just need the government to help me flesh it out, because – I'm having a difficult time seeing the charge, to be quite frank.
>
> GOVERNMENT:  At this point –
>
> •  •  •
>
> -- the defendant is continuing to retain the child outside of the country.  The family court was deciding what was in the best interest of the child, however, the custody agreement is silent on the defendant taking the child to India.[2]

---

[2] Both of these representations misstated the record.  The Family Court did **not** make a finding of the "best interests" of the child, and the Custody Agreement was **not** silent as to Defendant's ability to move to India.  It explicitly provided that Defendant could move with AAP outside the United States.

> There's a court order ordering him – a valid court order signed by the state ordering him to return the child to the United States.  And he has not done so, nor are there any plans for him to do so.

[Id. at 14-15.]

Defendant thereafter filed pretrial motions outlining applicable New Jersey family law, the parties' Custody Agreement, and the lack of due process afforded to Defendant in Family Court that led to the October 2018 Return Order (and subsequent Family Court orders).  [Dkt. No. 21.]  The Defendant also asserted that the Indictment was "void for vagueness."  [Dkt. No. 26.]  The Government countered that the Family Court orders did not violate New Jersey family law and that the Indictment was not void for vagueness.  [Dkt. No. 34.]

### C.    The Court's Initial Opinion and Order on February 18, 2022

Believing that there was no dispute as to the Custody Agreement (which gave Defendant permission to move to India with AAP) and the May 2017 Custody Order (which gave Defendant sole legal custody), the Court issued an initial Opinion and Order, dated February 18, 2022, setting forth its reasoning – that to the extent a Section 1204 criminal charge rests on interference with "parenting time" alone, as opposed to custody, the details of that parenting time must be concrete and established by either a court order or a legally binding agreement.[3]  [Dkt. Nos. 42, 43.]  Hence, an "agreement to agree" as to the other parent's parenting time, in general, would not satisfy the basic elements of a Section 1204 charge and upsets fundamental notions of due process.  The Court was poised to dismiss the Indictment because the apparently uncontroverted evidence presented by the

---

[3] Section 1204 makes it a crime to hinder or obstruct another parent's parental rights, which includes not only custody, but also "visiting rights," also referred to in some states, including New Jersey, as "parenting time."  See 18 U.S.C. § 1204; see also N.J.S.A. § 9:2-4.

parties did not appear to support a Section 1204 offense.  Specifically, it was the Court's view that the Government could not prove that Defendant violated the mother's "parental rights" within the meaning of the statute because the Family Court gave no specific commands by which Defendant could understand that his conduct could subject him to criminal penalties.  In other words, Defendant's failure to agree to parenting time terms for Poonamben Patel does not constitute a criminal violation.  Rather, it subjects Defendant to the jurisdiction of the Family Court to sort out.  As an exercise of caution, however, and because the Federal Rules of Criminal Procedure do not allow for summary judgment,[4] the Court offered the Government an opportunity to set forth what material facts, if any, were in dispute concerning a violation of Section 1204.  [Dkt No. 90.]

**D.     Oral Argument on Motion to Dismiss**

At oral argument on Defendant's continued Motion to Dismiss the Indictment, the Government's position of its case seemed to have changed.  Now, the Government suggested that by remaining in India from August 2017 to October 2018, Defendant violated Section 1204.  This after-the-fact-explanation-of-the-Indictment pivot presented considerable due process concerns to the Court:

> THE COURT: If the kidnapping occurs in July of 2017 when he does not return back from India, why has the government charged October of 2018? She doesn't have to go back to family court to get an order. The kidnapping happens as soon as he doesn't return under the government's theory.
>
> GOVERNMENT: Because there needs to be -- you are partially correct, Your Honor. There needs to be a reason for him to come back and not do it.

[Dkt No. 56, at 12:20–13:3.]

---

[4] See United States v. Levin, 973 F.2d 463, 468 n.1 (6th Cir. 1992).

But -- so Your Honor is thinking that we actually -- so under Your Honor's theory, we could have actually charged it as of August of 2017.

THE COURT: That's why I asked you, [. . .], when did the crime occur, and you said –

GOVERNMENT: I did. But it's a continuing offense. It is a continuing offense.

THE COURT: But that's not how you charged it.

GOVERNMENT: I charged it from October of 2018 based on that order requiring him to return to New Jersey with the child.

THE COURT: But don't you have -- isn't that a constructive amendment to the indictment now? **If you're going to argue to the jury that the crime occurred in July or August of 2017, doesn't the defendant have a right to know what crime he's being charged with? He's only being charged with failing to abide by the return order.**

GOVERNMENT: Right. Because that is when we are saying he interfered with her parental rights. **From that time when he's ordered to return, that's the optimal date that we will argue to the jury.  What we're arguing to the jury is -- because I'm sure defense would say, look, this May 2017 order gave him custody. Our point would be that was done under a fraudulent pretense, and that was done under a pretext.** And so that –

THE COURT: **But if you're seeking to undo a court order, the jury is not going to do that. There would be no way I would say to the jury was that order obtained under false pretenses such that it turns it into a kidnapping charge. That to me sounds like it's a family court dispute.** And her remedy was to go back before the state judge, undo the court order. Because if the jury is being asked to, in essence, undo the court order, I would never allow that.

GOVERNMENT: But she did –

THE COURT: The case law is very clear.

GOVERNMENT: The only way that you can undo a court order is through the court process, not through a jury.

GOVERNMENT: And I agree with you, Judge. That's not what I'm saying. She did go back and get a court order undoing the first order. That's what -- that's the crux of it, and that's why we charged that optimal date.

[Id. at 13:1014:25.]

THE COURT: **So you have a failure-to-return charge, perhaps.**

GOVERNMENT: **Which is what the statute allows us to charge. And - clearly a misstatement of the law.**

THE COURT: Where is there a failure to return – a failure to obey a court order charge in 1204?

GOVERNMENT: It's the retention outside of the United States. So whoever removes a child from the United States or attempts to do or retains a child outside the United States with the intent to obstruct the lawful exercise of parental rights. It's the government's contention that the October 2018 order to return required that the defendant bring the child back. And when he did not, then he is retaining the child outside the United States and he is affecting the victim's parental rights.

[Id. at 15:12–16:3.]

THE COURT: No. And what I'm referring to, and I want to focus on the statute because I think the government has not done a -- has not focused on the elements of what the statute requires, and so I want to go to the statute and the elements.

• • •

And let's go with the government's theory of the case that it happened – I guess the government' theory is that it continued to happen even though they didn't charge it, which is another whole issue, and Ms. Koch will address that, whether or not there's been a constructive amendment of the indictment.

[Id. at 26:2–19.]

THE COURT: Now, the government comes back and says, well, it started when he didn't return in August of 2017. So my other due process issue is, isn't that a constructive amendment because it charges October of 2018? So that's another due process issue that I have.

[Id. at 45:22–46:1.]

And, again, the difficulty is, is that there is no summary judgment vehicle for a court in a criminal case. Whether this case survives beyond a directed verdict, who knows. Whether or not, even if there is a verdict, it stands, who knows. Because – I sound like I'm repeating myself – I think this case smacks of all kinds of due process violations. And I don't know how to deal with it unless and until I hear the facts.

And if, at the end of the day, the verdict is in favor of the defendant, then the jury has spoken. If it's in favor of the defendant and I throw the verdict out, then the Court has spoken.

But at this point, the government has its theories of the case. **Whether there's a constructive amendment or not, I don't know, remains to be seen. And I guess I'll have to confront the issues as they come in.**

[Id. at 48:1449:4.]

As the record makes clear, the Court continued to press the Government as to the relevance of the Custody Agreement and the May 2017 Custody Order if the crime, as charged in the Indictment, occurred in October 2018. The Government appeared to gradually suggest that the unlawful retention of AAP occurred in August 2017 when Defendant did not return to the United States. Having moved away from its initial position that the failure to comply with the October 2018 Return Order was a Section 1204 violation, the Government ultimately persuaded the Court that the Indictment might state a Section 1204 claim, depending on what the Patels had agreed as to Poonamben's "parenting time," if any, but warned the Government that the possibility of an impermissible constructive amendment of the Indictment loomed. [Dkt. No. 62.]

### E.  Defendant Prepares His Case

Defendant prepared his case as if violating the October 2018 Return Order was the charge against him. Indeed, a mere few days before trial, counsel for Defendant submitted a pre-trial letter in reply to the Government's opposition to Defendant's proposed matrimonial law expert. In that letter, Defendant's counsel reiterated Defendant's

understanding of the nature of the charges against Defendant:

> The [G]overnment's case is centered around the defendant's failure to 'obey' the October 16, 2018, family court order to return the child, and that order is the crux of the Indictment . . . .  The government has elected not to prosecute the defendant for defrauding the mother by entering into the custody agreement that led to the May 2, 2017, order . . . through coercion or duress (there is likely no federal basis for such prosecution and to allow such argument at this point would plainly constitute a variance of the indictment).

[Dkt. No. 94.]  Of critical note, the Government never dispelled counsel of her

understanding of the charges against her client.[5]

### THE TRIAL

Trial commenced on July 18, 2022.  On the second day of trial this Court expressed a

concern that the Government had constructively amended the Indictment:

> So before we break for the day, and the parties know this, it's been a concern of mine for quite some time about this case, and it's something that we'll have to wrestle with. But as I sit and I listen to the evidence, I become increasingly concerned that my jury charge will constructively amend the indictment; that I will broaden the basis for the conviction. Because I have sat through now a full day, and it seems to me the Government's theory of the case is that the crime was committed in May of 2017; that the Government witness [Poonamben Patel] was duped into filing – signing the Custody Agreement and the crime occurred in July.

[Tr. at 258:16–259:1.]

By the fourth day of trial, this Court was clearly exacerbated by the means through

which the Government sought to secure a conviction – asking a jury to usurp the role of the

Family Court:

> I have sat through this trial now for several days, and it is clear to me that the parties are attempting to attack the Family Court proceedings. That happens in Family Court. It doesn't happen in a criminal case.

---

[5] The Court also denied Defendant's request to introduce the testimony of a matrimonial expert, finding that the Court, if appropriate, could instruct the jury as to the applicable family laws of New Jersey.

So to the extent that this jury has heard evidence and argument about whether or not the Family Court order was valid or not valid and whether or not the proceedings were valid or not valid, to my thinking, has no place in this criminal case, and so I am working diligently on crafting charges to the jury that communicate that.

This court is not a Family Court and does not call upon the jury and should not call upon the jury to decide Family Court issues, and that's mostly what this jury has heard about. The jury heard about [how] the May [2017 Custody Order] is not valid. That's inappropriate. And so I – I'm struggling with the jury charges to sort of correct the course, but we can talk about that.

[Tr. at 410:13–411:4.]

The following is a summary of the evidence, relevant for purposes of the pending motion, offered at trial:

## A.    The Parties to the Custody Dispute

Sometime in 2015, Defendant, a United States citizen, and Poonamben Patel, who had entered the United States illegally,[6] met and began to live together.  [Tr. at 194.]  On November 28, 2016, Poonamben Patel gave birth to AAP, the Defendants' son.  Shortly after the birth of AAP, the parents' relationship deteriorated.[7]  Poonamben Patel testified

---

[6] How many times Poonamben Patel had entered the United States illegally and what she had told immigration officials were the focus of much dispute at trial.  So, too, were her pending applications before the Immigration and Naturalization Service.  She had applied for asylum, a U-Visa, and United States citizenship as a result of her marriage to her now current husband, Tushar Patel, one of Defendant's childhood friends.  [Tr. at 391:14–17.]  That the Government turned over many of these documents during trial, after the Court's expedited *in camera* review, clearly prejudiced the defense's preparation.

[7] It is shocking that the Government – with no objection from the defense – elicited testimony from Poonamben Patel that while she was pregnant, Defendant's mother forced her to take sleeping pills to result in an overdose.  [Tr. 198-99.]  She also testified that Defendant's parents harassed her, Defendant's mother beat her up, and Defendant supported his parents' behavior.  [Id. at 199-200.]  Such testimony is relevant in a custody battle, not here.  The Government elicited this testimony even though the Hague Court had found Poonamben Patel's testimony regarding these allegations and other allegations of physical abuse not credible.  [See Dkt. No. 21-5 ¶ 84 ("I find that her account of the grandmother's attempt to choke and force pills down her (and abort AAP) was untrue.").]  That the Government later elicited testimony regarding the couple's intimacy highlights the

that within a week of AAP's birth, Defendant began to have conversations with her about taking AAP to India to meet Defendant's mother (AAP's grandmother). She testified that Defendant told her that in order to travel to India, however, AAP would need a visa; but for AAP to obtain a visa, Poonamben Patel would have to give custody to Defendant. [Tr. at 214:7-8 ("He told me that because he's a citizen, you give the custody to me, and then A-'s visa would be approved.").]

### B.   The Custody Agreement

The Government introduced into evidence a custody agreement dated March 8, 2017 (the "Custody Agreement"). [Gov't Ex. 5.] Pursuant to the terms of the Custody Agreement, Defendant was to have sole custody of AAP; Defendant and AAP could live anywhere inside or outside the United States; and Defendant was responsible for AAP's welfare, as Poonamben Patel was not able to take care of her son. The Custody Agreement provided, in relevant part:

<u>SOLE CUSTODY</u>

1. The Father shall have <u>sole legal and physical custody</u> of the minor child, AAP born on 2016. All major decisions affecting his health, growth, education, welfare and development shall be made <u>solely by the Fathe</u>r.

2. The Father shall be the <u>parent of primary residence</u> for A. All day-to-day decisions including the treatment of minor health problems and injuries, diet, television, rules and discipline, bedtime etc. shall be made <u>solely by the Father</u>.

3. The Father is permitted to move <u>anywhere</u>, both within and outside of the United States, with A without the Mother's consent.

4. The Father is permitted to do anything for the child as if he was a single parent all <u>without</u> the Mother's consent.

---

unacceptable measures the Government took to secure a conviction. [<u>infra.</u> at 18.]

14

5. The Father is permitted to do anything regarding the citizenship and residency status of the child in the United States or any other country including but not limited to applying, renewing or terminating passports, visas, dual citizenship, residency status applications and the like.

6. The parties acknowledge that due to their financial and other circumstances, this is the best decision for the welfare of A as the Mother is not able to take care of A.

[Id.]

Then, the Government attacked the validity of the Custody Agreement. According to Poonamben Patel, she signed the Custody Agreement because Defendant misrepresented to her that it was an application for AAP's VISA:

Q. "Why did you sign it?

A. So that A - can get his visas."

[Tr. at 216:24-25.]

Q. Did you think by signing this that you were giving up your custody rights? Did you think you were giving up your custody rights to your son?

A. No, sir. He told me that this is for VISAS."

[Tr. at 217:1-4.]

Q. At the time, did you trust the defendant?

A. Yes sir. He had told me that this signature is only for visa purposes."

[Tr. at 222-223.]

During cross-examination, Poonamben Patel persisted in her testimony that the Custody Agreement had been the product of fraud and coercion:

Q. Well, the very first sentence of the custody agreement is: Whereas, the parties were never married; and whereas, there was one child born of the parties; whereas, the parties, by this agreement, are desirous of settling all questions relating to custody of the child; and whereas, both parties have access to independent counsel of their own. This document is signed by both of us because the parties mutually agree to it. Isn't that what it says at page 1?

A. I did not read anything that was contained in that document.  He came and he said for me to sign it over here so that he has to go to the travel agency to get – to start the visa proceedings for A-.

Q. So let's say that you never read this document.  You don't mean to tell this jury under oath that you never discussed these things that are contained in this document with Amit, do you?

A. No.  As a matter of fact, he came in the morning with this document, told me that you have to sign this document.  Please sign this document because I got to run to Quick Travels to start the visa application.  And then from there, I got to go to my job.  So we never had a chance to discuss what was in the document.  He just told me to sign it and I signed it.

Q. you never – you didn't actually require him to take sole legal and physical custody of your son?

A. No, sir.  This document was solely signed for the purposes of getting the visas.  He never mentioned it to me or it was not discussed that you give me sole custody of A-.

[Tr. 355:21–357:2.]

### C.    Family Court Proceedings

The Government turned next to calling into question what transpired a few months later before the Family Court in May 2017.  Poonamben Patel testified that Defendant told her to fill out some forms for a hearing, and upon receiving a notice of a May 1, 2017, court hearing, the two of them travelled to Middlesex Family Court.  Poonamben Patel testified that Defendant told her not to be afraid, and "whatever I tell you, you give the answers to that only."  [Tr. at 220:8–9.]  As she testified,

Q. Was there any conversation between you and the defendant as to what to say during the court proceeding?

A. Yes.

Q. Were you given any instructions?

A. Yes. He told me that do not be afraid, do not cry, and whatever I tell you, you give the answers to that only.

16

Q. And you said "he." Who are you referring to?

A. Amit.

Q. He said to you only give answers that he tells you.  Do you recall what he instructed you to say?

A. So he instructed me to give the answers in such a way that if I was asked as to why I'm willing to give the custody of the child away, you have to say that because you don't have any papers over here and you are not working.  That's number one.

Number two is that because I'm living at my aunt's house, or if they ask how many days do you want to see A-, then you say that, no, we are having a joint custody.

[Tr. at 220:4–20.]

Poonamben Patel also testified that the Defendant told her to lie to the Court's

liaison, Ms. Brinda Sreevatsava:

Q. But back then when you were meeting with Ms. Sreevatsava were you still in love with [Defendant]?[8]

A. Yes.

Q. Did you still want to get married to him?

A. Yes.

Q. Did you tell Ms. Sreevatsava that you were moving out as soon as the order was signed?

A. Yes.

Q. Was that true?

A. No, sir. I was living with my son in Piscataway.

Q. And were you going to continue to live with your son in Piscataway after that May 1, 2017 hearing?

---

[8] The relevance of such testimony could only be to attack Defendant's character, along with the May 2017 Custody Order.

A. Yes.

Q. And who told you to tell Ms. Sreevatsava that you were moving out as soon as the order was signed?
A. Amit told me.

Q. And why did you tell that lie to Ms. Sreevatsava?

A. Amit told me that if I say these words, then only the custody will be approved.

Q. And after speaking with Ms. Sreevatsava, did you ever meet with the judge?

A. No.

Q. During that meeting with Ms. Sreevatsava, were you ever informed that you would, if the order were entered, have no contact with your son?

A. She did ask me how many days do I want to see my son, and Amit had instructed me that if I was asked that question, then you give the answer that it's a mutual agreement.

[Tr. at 222:21–223:24.]

The Government then elicited evidence of the relationship between Defendant and

Poonamben Patel, after the May 2017 Custody Order which gave sole legal custody to

Defendant.[9]

Q. And in May of 2017, were you still intimate?

A. Yes.

Q. What about June of 2017?

A. Yes.

Q. You were still -- what were the sleeping arrangements?

---

[9] As if the questions related to the parents' intimacy were not enough, and to further prejudice Defendant, the Government asked the following question at trial: "at some point prior to the defendant leaving for India with your, did you learn that you were pregnant?" [Tr. at 233:1-2.] The Court immediately went to sidebar and sustained the defense objection under Rule 403.

18

A. We were sleeping together, all three of us.

Q. And were you still intimate?
A. Yes.

Q. And what about July, was it the same?

A. Yes.

Q. When, if you know, was the lease up for the apartment in Piscataway?

A. First August 2017.

[Tr. 230:1-13.]

### D.   Defendant and AAP Leave for India

At trial, Poonamben Patel testified that in 2017, Defendant told her that he was going to India with AAP for "two weeks, and if the necessity arises and it has to be extended, then I should be back within a month."  [Tr. at 230:21–22.]  The evidence revealed that Defendant purchased one-way tickets, put all of the items from the apartment into a storage unit, and Poonamben Patel went to stay with her aunt, Bhavna Patel in Cherry Hill, New Jersey.  [Tr. at 231-32.]  On July 26, 2017, Defendant, Poonamben Patel, and AAP drove together to the Newark International Airport.  [Tr. at 236.]  Defendant and AAP flew, via one-way tickets, to India.

The versions as to why Defendant went to India with AAP were vastly different.  Poonamben Patel testified that Defendant was going to India for two weeks, possibly a month to visit his parents.  To support Poonamben Patel's version, the Government elicited the hearsay testimony of Poonamben Patel's aunt, Bhavna Patel:

Q. Around May of 2017, did you have conversations with Poonamben and Amitkumar regarding their son and Amitkumar traveling to a foreign country?

19

A. The year I don't know, but the first time Poonamben called
me. Amit want to take the child to India to see the parents,
but I have to give the custody. And I said what meaning of
that? What are you talking about? She says I have to give him
the solo custody or something so he can take the child. I
said, are you okay with that? She said, yeah, I'm fine,
because they come back, and he said he gonna meet me every day
on the Facetime and I'm okay with that. The same time when
Amit talked with me, everybody called me "Foy." Foy, don't
worry, she has to sign the paper. Otherwise, I cannot take A with
me.

Q. Does Foy mean aunt?

A. Aunt, aunt, yeah.

Q. And so does everybody call you Foy?

A. Foy, yeah.

[Tr. at 474:4–21.]  Bhavna Patel also testified that Defendant told her that he was

going to take AAP to India for a month or two weeks.  [Tr. at 475:16–17 ("A month

or two weeks.  That's something like he had said.  I don't remember a lot, but it was

two weeks to a month.").]

By contrast, Defendant testified that Poonamben Patel had agreed to his permanent

move to India.  Defendant testified that Poonamben Patel understood that he and AAP

were moving to India, that because he would not marry Poonamben Patel, her family

directed that Defendant take full custody of AAP.  [Tr. at 539, 546.]  As evidence to support

his testimony, he introduced, in addition to the terms of the Custody Agreement, the fact

that the apartment lease was expiring the end of July, that he had quit his job, that he had

sold his car to his brother-in-law (Poonamben Patel's husband), and, as noted, that he had

bought one-way tickets for himself and AAP.

20

The parties dispute what happened when Defendant reached India.  According to Poonamben Patel, she attempted to contact Defendant by Whats App messenger for days, but to no avail.[10]  Defendant testified it was the other way around and Poonamben Patel ceased all contact with her son shortly after their arrival.

### E.    Poonamben Patel's Motion to Modify the May 2017 Custody Order

Fast forward to July 2018, more than one year later.  The Government presented the testimony of Poonamben Patel's attorney, Marilyn Labrada Dumé. Ms. Dumé had been retained earlier by Poonamben Patel in August 2017 to assist in her immigration matters. ("She desperately wanted a work permit and her former attorney hadn't filed for a work permit, so I took over the asylum case and immediately filed for a work permit because she needed to work."  [Tr. at 96:20-25; 241.])  It was noteworthy, and undisputed, that for almost one year after Defendant and AAP left for India, but did not return, Poonamben Patel never sought to modify or undo the Custody Agreement nor the May 2017 Custody Order which New Jersey family law would have permitted her to do.[11]

### F.    Poonamben Patel's Motion for Custody

On July 12, 2018, on behalf of Poonamben Patel, Dumé filed a complaint and motion for custody with the Family Court seeking the return of AAP.  [Gov't. Ex. PP.] Poonamben Patel's motion sought to modify the May 2017 Custody Order.  [Tr. at 97:128.]

---

[10] Without defense objection, Dumé testified as to Poonamben Patel's hearsay statements: "The father of the child didn't want her speaking to the child."  [Tr. at 97 ("It's my understanding that their agreement was that he [Defendant] would – she would be able to Skype and talk to the child and all of a sudden, he shut her down.").]  The agreement between the parents that Dume testified to was not explored.

[11] Jurisdiction over custody matters in New Jersey is governed by NJS 2A:34-65, initial custody jurisdiction, and NJS 2A:34-66, exclusive continuing jurisdiction.  As became apparent at trial, there was a legitimate question as to whether the Family Court lost jurisdiction when Poonamben Patel moved to New York.

A hearing date was set for September 17, 2018, on which date Poonamben Patel along with her attorney attended the hearing.  [Tr. at 97.] The Defendant did not attend the proceeding as he was in India.

Defendant introduced a letter to the Family Court dated before the hearing that Defendant had submitted to the Family Court.  [Gov't. Ex. 90.]  In that letter, Defendant acknowledged having received notice of the September 17, 2018, New Jersey hearing. Defendant also advised the Family Court that he and AAP were living in India, and he informed the Family Court of the Custody Agreement and May 2017 Custody Order.  The letter bears the "Received & Filed" stamp of the Superior Court on October 12, 2018.  [Id.] Defendant also testified that he made six or seven telephone calls, including on September 19 and 24, 2018, to the Family Court "customer service." [Tr. at 560; 564-65; Ex. 105AR.] He recorded those calls, and the defense introduced them into evidence.  [Id.]  In those calls, Defendant attempted to ascertain the purpose of the hearing.

Apparently, unaware of Defendant's efforts to reach the Family Court, the Family Court issued the October 2018 Return Order (perhaps without jurisdiction to do so), reproduced below:

> Per Order dated, 05/01/2017, Plaintiff was granted sole custody of the minor child, A P (DOB:  2016).  Defendant applied through her attorney, Jessica Marie Gonzalo from the law Firm of Labrada Dumé Associates, North Bergen, NJ.  Per Defendant, Plaintiff took the minor child to India on 07/26/2017.  Defendant agreed to Plaintiff taking the minor child, for two weeks of vacation.  Plaintiff has not returned the minor child to United States. Per Defendant she called the Plaintiff when he reached India.  Plaintiff has not brought the minor child, to United States since, July of 2017.  When Defendant called the Plaintiff as to when he would return the child and for child's wellbeing, plaintiff informed Defendant he was not bringing the child back to United states.  Plaintiff to return the child to United States immediately.

[Govt. Ex. 2.]  **Importantly, the Family Court did <u>not</u> rule on Poonamben Patel's motion to modify custody in the October 2018 Return Order.**

Dumé also testified that Dumé's paralegal, Evelyn Martinez, e-mailed the October 2018 Return Order to Defendant's email address; another attorney in Dumé's firm, Jessica Gonzalo, also sent via FedEx a copy of the October 2018 Return Order to him.  [Gov't. Ex. 11, 12]; <u>see also</u> Tr. at 100.]  In her cover letter to Defendant, Ms. Gonzalo represented that the Family Court had ordered "that Poonamben Patel be granted custody of AAP."  **This was a misstatement of the record by Poonamben Patel's lawyer.[12]**  [Gov't. Ex. 12.]  Poonamben Patel testified that she sent the letter and October 2018 Return Order to Defendant at his home address in India via FedEx.  Per the instructions of her lawyer, she also sent the October 2018 Return Order to the United States Consulate and the Sinor Police Station in India.  [Tr. at 268.]  On cross-examination, Poonamben Patel testified that the FedEx letter was returned to her as "not received."  [Tr. at 382.]

The Government read into the record a statement Defendant had made during the Hague proceedings, where he said that he did not learn of the Dume's email until sometime later in 2021, when he searched his e-mails and found it in his junk box.  [Tr. at 614-16.]  Defendant testified that he had amended this statement during the Hague proceedings because it contained an error.  At sidebar, the Court expressed concern that the Government was unfairly suggesting to the jury that Defendant lied, when in fact, Defendant had corrected the error and amended his statement, and the Government had the amended

---

[12] That the defense stipulated to the admission of this unredacted exhibit is perplexing.

statement.  [Tr. 617.]  Ultimately, the Government chose to cross-examine Defendant on his

amended statement, rather than leaving it to the defense to bring up on redirect.  [Tr. 618-

19.]  Defendant testified that he first received the email from Dume's firm on October 19,

2018, but thought it was junk mail and ignored it.  [Tr. at 618-19.]

### G.    Criminal Complaint – September 27, 2019

A little less than a year later, in June or July of 2019, Poonamben Patel met with an

agent at the Cherry Hill, New Jersey, FBI Office.  On September 27, 2019, a Criminal

Complaint was filed charging Defendant with a violation of IPKA, 18 U.S.C. § 1204.  [Dkt.

No. 1.]

### H.    The Family Court's Subsequent Order on December 5, 2019

On December 5, 2019, the Family Court, (having set a hearing date of November 26,

2019 and again, perhaps without jurisdiction to do so), entered another order.  The order

provided:

> It is further ORDERED: Defendant/biological mother appeared on her
> application for enforcement of the prior court order of 9/17/2018.
> Plaintiff/biological father failed to appear.  Court notices mailed to plaintiff's
> last known address in India were not returned.  On 11/19/19, plaintiff called
> the Customer Service hotline inquiring about the court notice and was
> advised by CSR that he has a hearing.  As plaintiff stated he lives in India, the
> CSR advised him he could appear telephonically.  When court staff attempted
> to call plaintiff at phone number he provided, we were unable to contact him
> as it was an international phone call.  Matter to be rescheduled.  Defendant
> requests Gujarati interpreter.

[Govt. Ex. 7.]

The Defendant, reading from Exhibit AKP-3, testified that he received only the

summons requiring him to attend a November 26, 2019 hearing, that he "immediately

called the court to make further inquiry."  [Tr. 619.]  Defendant testified he did not receive

the December 5, 2019, order.  [Tr. at 621-22.]

24

### I.       Poonamben Patel's Friend Lures Defendant to London

Months later, in the fall of 2020, Poonamben Patel and her now husband, Tushar Patel, a former friend of Defendant's, engaged in a scheme to lure Defendant and his son to travel to London for a supposed mini-vacation with Tushar Patel.  The site of London was intentional because the United Kingdom is a party to The Hague Abduction Convention where civil proceedings regarding child abductions may be held.  Poonamben Patel alerted the Federal Bureau of Investigation to the travel plans and provided the FBI with the travel documentation.  [Tr. at 279; 393.]  Upon his entrance at Heathrow International Airport, on October 2, 2020, Defendant was arrested.  AAP was taken into foster care custody in London pending the completion of the Hague Court proceedings.[13]

### J.       The Hague Court Proceedings

In relevant part, the Hague Court considered whether or not Poonamben Patel had consented to AAP's removal from the United States to live permanently or for a short visit. After a five-day trial before the Hague Court, the Hague Court found that she had. The court found that Poonamben Patel's "evidence contained several inconsistencies on important issues" [Tr.  at 457:18-20],[14] and that Poonamben Patel had been "**deliberately**

---

[13] The U.S. Supreme Court case <u>California v. Superior Court of California, San Bernadino County</u>, 482 U.S. 400 (1987) is instructive. There, the Court in discussing charges brought under a similar statute governing interstate parental kidnapping – the Parental Kidnapping Prevention Act ("PKPA") – , commented on the potential for parents waging custody battles in different jurisdictions to be "not only innocent of the charges made against them, but also victims of a possible abuse of the criminal process." <u>Id.</u> at 412. Here, the Court is also concerned about a point raised by the dissent:  "[c]ompelling extradition to face a criminal charge which cannot lead to a conviction, no less than 'child snatching,' is the coerced transportation of a party to a custodial dispute to another forum in order to serve a private interest." <u>Id.</u> at 420 (Stevens, J., dissenting). The IPKA should also "be interpreted to discourage" such coercion. <u>Id.</u> at 421.

[14] During this time, Poonamben Patel filed yet another request for modification of the May 2017 Custody Order while the Hague Court proceedings were in progress. The Family

**lying** in making her various allegations" regarding Defendant as part of "a **deliberate attempt** to support a case on abduction, most probably with a view to improving her prospects of securing a green card and also enabling her to have [AAP] in the USA."  [Dkt. No. 21-5 ¶ 83 (emphasis added).].  Specifically, the Hague Court found:

> I find that in their discussions prior to the custody agreement, the custody order and the departure of [AAP] to India on 27 July 2017 the mother had agreed that the father should be granted sole custody over [AAP] because she had agreed that the father should take full responsibility for [AAP] and he could take him to India permanently and care for him there. The mother agreed to the custody agreement and custody order as a means to enable the father to obtain a visa to take [AAP} to India permanently.  She was fully aware of the intent of the custody agreement which were read out to her in Gujarati by Ms. TP, a new Jersey lawyer.  Her agreement to [AAP's] departure and the custody order was not induced by the father falsely assuring her that he was only going for a month for a holiday or for the purpose of a DNA test.  The mother knew and agreed that the father and AAP were moving permanently.  The agreement arose from the parents' decision to separate and live their own lives in circumstances where the father was unwilling to marry the mother.

[Id. at ¶ 82.]

The jury did not hear much of the Hague Court's findings as the defense did not pursue such course particularly as to Poonamben Patel's credibility.  However, because the Government improperly insinuated to the jury that the Hague Court had awarded custody to Defendant's grandparents and not to Defendant [Tr. at 462-463], the Court permitted the jury to hear the precise ruling of the Hague Court:  that Poonamben Patel's Hague

---

Court, aware that Defendant was in custody and did not have an opportunity to be heard, modified the May 2017 Order and granted custody to Poonamben Patel on March 24, 2021, two days before the Hague Court ruling. Defendant has argued that such order was improvidently entered. There can be little doubt about that. Remarkably, at trial, the Government sought to introduce this evidence, but the Court prohibited its admission. [Tr. at 105.] The Court's ruling, however, did not deter the Government from doing an end run around the Court's ruling, as explained below, by continuing to argue to the jury that Defendant was in violation of the October 2018 Return Order "to this day" even though (1) Defendant had been in custody, and (2) the Hague Court had ordered AAP's return to India, not the United States.

Convention application was dismissed, and that AAP "has been through a difficult time and needs to return to his home[] and [the Defendant] in due course."  [Tr. at 466.][15]

### K.    Defendant is Extradited; Emergency Bail Hearing

In September 2021, Defendant was extradited to the United States and after his initial appearance before the United States Magistrate Judge on September 10, 2021, was ordered detained.  [Dkt. No. 10.]  On February 4, 2022, this Court held a hearing on Defendant's emergency application for bail.  The Court ordered Defendant's pre-trial release on certain conditions.  [Dkt. No. 36.]

### L.    Defendant's Rule 29 Motion: Constructive Amendment at Trial

At the conclusion of the Government's case, Defendant moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) on the weight of the evidence.  Defendant also argued that there had been an impermissible actual and constructive amendment of the Indictment:

> DEFENSE: Okay.  So, Your Honor, I have two grounds for the Rule 29 motion.
>
> The first is that all of the testimony in this case has been centered and essentially proves that the kidnapping occurred July 26, 2017.  The Government's main witness, Poonamben Patel, testified she never read the Custody Agreement.  She was duped into signing the Custody Agreement.  She didn't - - it was never read to her in Gujarati.  Oh, that's her signature, but she didn't appear in front of a notary and present identification.
>
> Her testimony is that Amit Patel fooled her into agreeing to give consent for a two week vacation, but that's not what the indictment charges.  The indictment charges clearly that the kidnapping occurred in October 16, 2018, when he failed to obey the return order.  Government Exhibit 24, the receipt

---

[15] The relevance of the Hague Court proceedings was the subject of pre-trial motions. The Court ruled that the statements of Poonamben Patel and the Hague Court's findings could come in on cross-examination under Fed. R. Evid. 608(b), to the extent Poonamben Patel opened the door to impeachment of her credibility. [See Dkt. No. 90, at 8-13.]

27

notices for the FedEx packages do not show Amitkumar's signature on any of those packages.

In fact, the Government's own evidence is contrary to the Indictment, because if you look at the U visa that was filed on behalf of Ms. Patel, it says the kidnapping occurred July 26, 2017.

So the Government can't have it both ways. They can't say, well, our FBI agent said the kidnapping occurred on one date, but Ms. Patel said it occurred immediately because he lied to her and he was such a romantic guy and she trusted him completely. It's a complete turnaround and twist of what the theory was.

The Government is trying to put a round peg in a square hole. They wrote the Indictment carefully because they knew that this would be a problem. They knew they couldn't charge the case as a kidnapping as of May 2017, and now they put their witness on and they see that maybe that's what the allegations she had to make were.

So they're stuck with her, Your Honor. That's their witness. They can't then just, through legalese and magic and smoke and mirrors say – **in fact, it's been incredibly difficult to try this case because that was their theory, that it was the failure to obey the return order.**

[Tr. at 506 – 508 (emphasis added).]

Even in response to the defense's Rule 29 motion, the Government appeared

to pivot to yet another theory of the case, which this Court promptly rejected:

GOVERNMENT: As the Court is aware, and we've had many discussions about this, even if she signed over full legal and joint custody as issued by the order of May 1, the order also allowed Ms. Patel to file for joint custody if she so chooses, which she did so choose and which she did file in August of the following year, **which she filed and was ultimately granted October 16th of 2018.** There is no constructive amendment, or actual or –

THE COURT: See, I think that totally misstates the law [. . .]. I won't allow you to make that argument to the jury. I think that's a total misstatement of the law. You cannot argue to the jury that a parent's ability or inchoate, inchoate ability to file for joint custody does not create parental rights under the law, under 1204. It does not. That's the first error in the argument.

The second error in the argument is that the October order does not in and of itself create parental rights, so I won't permit you to argue that to the jury. Those would be two misstatements of the law.

Tr. at 510-11 (emphasis added)

What this Court did not appreciate at trial was this additional misstatement of the

record by the Government:  the October 2018 Return Order did **not** grant Poonamben

Patel's application to modify the May 2017 Custody Order.  Pursuant to Federal Rule of

Criminal Procedure 29(b), the Court reserved its decision and submitted the case to the jury.

On July 22, 2022, the jury returned a verdict of guilty as to the Indictment.  [Dkt. No. 113.]

      The Court now turns to Defendant's post-trial motions.

<u>**ANALYSIS**</u>

      Defendant moves to vacate his conviction and for a new trial pursuant to Fed. R.

Crim. P. 33, arguing that the Government constructively amended the Indictment.[16]  More

specifically, Defendant contends that the Government "failed to prove its theory that the

[October 2018 Return Order] established parental rights for Poonamben [Patel], which were

violated by Defendant when he did not return AAP to the United States . . . months after he

left."  [Dkt. 116, at 9.]  Instead, Defendant argues that the Government's evidence and

argument presented at trial "served only to persuade the jury to itself nullify and vacate the

[May 2017 Custody Order], something that this Court had said it would not permit the

[G]overnment to do."  [Dkt. 116, at 9.]  Defendant further argues that "while the [C]ourt

tried to 'undo the damage' with its final Jury Charge, it was too late.  This misconduct by

the [G]overnment violated Defendant's right to fair warning of the alleged criminal conduct

and resulted in constructive amendment of the Indictment."  <u>Id.</u>  The Government opposes

the motion.

---

[16] Although Defendant argued at trial that an impermissible constructive amendment of the
Indictment warrants a judgment of acquittal by the Court, pursuant to Fed. R. Crim. P. 29,
Defendant now correctly concedes that "the remedy for such an error is typically a new
trial."  [Dkt. No. 116, at 9 n.5 (citing <u>United States v. McKee</u>, 506 F.3d 225, 251 (3d Cir.
2007); <u>United States v. Sanders</u>, 966 F.3d 397, 408 (5th Cir. 2020); <u>United States v.
Milstein</u>, 401 F.3d 53, 66 (2d Cir. 2005)).]
.

Whenever the basis for a conviction deviates too far from the crime charged in an indictment, a criminal defendant is deprived of his constitutional rights to due process as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."  U.S. Const. amend. VI.  The Sixth Amendment further requires that a criminal defendant be provided with sufficient notice of the charges to "apprise[] the defendant of what he must be prepared to meet" at trial.  United States v. Huet, 665 F.3d 588, 595 (3d Cir. 2012) (quoting United States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007)).  Failing to provide such notice to a criminal defendant works a manifest injustice by forcing the defendant to guess at the basis for the allegations against him, leaving him vulnerable to trial by ambush.  Id.

Moreover, the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury. . ." U.S. Const. amend. V. Thus, the Fifth Amendment prohibits a criminal defendant from being "tried on charges that are not made in the indictment against him," and he may not be convicted on theories that the indictment "cannot fairly be read as charging." Stirone v. United States, 361 U.S. 212, 217 (1960) (reversing a conviction for interference with interstate commerce in violation of the Hobbs Act when the only such interference charged in the indictment was the importation of sand into Pennsylvania, but evidence at trial also showed further interference via exportation of steel from Pennsylvania and the jury was instructed it could convict for either the importation of sand or the exportation of steel).  Otherwise, the role of the Grand Jury in criminal proceedings is undermined, as "the very purpose of the requirement that a man be indicted by grand jury is

30

to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Id*. at 218.

The Third Circuit explained that there are "two types of variations between the charges in an indictment and the evidence at trial. . . ":

(1) [constructive] amendments of the indictment when its charging terms are altered; and

(2) variances, where the charging terms of the indictment are not changed but when the evidence at the trial proves facts materially different from those alleged in the indictment.

United States v. Daraio, 445 F.3d 253, 259 (3d Cir. 2006) (citing United States v. Castro, 776 F.2d 1118, 1121 (3d Cir.1985)).  Federal courts also recognize that "[t]he line between a constructive amendment and a variance is at times difficult to draw," but the distinction depends on whether "**the charging terms [of the indictment] are unchanged**." Id. at 261 (emphasis added).  In other words, a constructive amendment occurs when the essential terms of the charge, as set forth in the Indictment, are modified in such a way that there is a substantial likelihood that the jury may have convicted Defendant for an offense other than what the Indictment returned by the Grand Jury actually charged.  See Daraio, 445 F.3d at 259–60.

A constructive amendment of an indictment constitutes "a *per se* violation of the [F]ifth [A]mendment's grand jury clause." United States v. Syme, 276 F.3d 131, 148 (3d Cir. 2002) (citations omitted).  On the other hand, a conviction based upon "a variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense." Daraio, 445 F.3d at 261–62.  Here, an essential charging term in the Indictment was that Defendant violated Section 1204 "from at least as early as October 19, 2018," three days after he received the October 2018 Return Order.  [Dkt. No. 5, at ¶ 4.]  However, the

31

Government presented several, albeit internally inconsistent, theories at trial regarding

"when" and "how" Defendant committed the offense.  The Court finds that such theories

directly conflict with the charging terms of the Indictment, causing serious due process

issues that cannot be overlooked.  As discussed below, the Government constructively

amended the Indictment at trial in at least two ways.  Accordingly, the Court need not reach

the issue of whether any of the Government's conduct at trial could also be considered an

impermissible variance from the crime charged in the Indictment.[17]

## I.    The Government Presented At Least Two Theories of Defendant's Culpability that Constructively Amended the Indictment

When considering a constructive amendment argument, "[t]he key inquiry is

whether the defendant was convicted of the same conduct for which he was indicted."

Daraio, 445 F.3d at 260 (citing United States v. Robles-Vertiz, 155 F.3d 725, 729 (5th Cir.

1998)).  Trial evidence, argument, and even the Court's own instructions can all form the

basis of a constructive amendment "by broadening the possible bases for conviction from

that which appeared in the indictment."  United States v. McKee, 506 F.3d 225, 229 (3d

Cir. 2007).  The inquiry presently before the Court is whether the Defendant was tried and

found guilty of an offense set out in the Indictment.  United States v. Navarro, 145 F.3d

---

[17] The Court finds that both of the Government's theories, discussed below, constitute separate constructive amendments of the Indictment by altering the charging terms of the Indictment.  In any event, the Court finds that each such theory, as presented by the Government at trial, also clearly prejudiced Defendant's **substantial rights**, namely, his right to prepare a defense and not be misled or surprised at trial. See Daraio, 445 F.3d 261. To put it simply, because the Government's theory of the case kept changing, including at trial and in ways that did not comport with the Court's rulings, the Court finds that Defendant did not have a meaningful opportunity to prepare his defense.  Accordingly, even if the Court found that the Government's theories were instead variances that proved facts "materially different" from those set forth in the Indictment, which the Government very well may argue on appeal, the Court's conclusion that due process requires vacatur of Defendant's conviction would not change. Id.

580, 584-85 (3d Cir. 1998).  In discussing its earlier decisions in Daraio and McKee, the

Third Circuit further instructed that the constructive amendment inquiry is twofold and

requires the Court to consider (1) whether the Government modified essential terms of the

Indictment; and whether in doing so, (2) the Government broadened the possible bases for

conviction.  United States v. Centeno, 793 F.3d 378, 390 (3d Cir. 2015) (citations omitted).

      In his moving brief, Defendant complains of only one fatal constructive amendment

of the Indictment, to wit, the Government's presentation of evidence that he violated

Section 1204 by failing to return from India in August 2017.[18]  The Court agrees and

discusses the issue raised by Defendant as "Constructive Amendment No. 2" below.

However, the Court also finds that the record unquestionably supports the conclusion that

the Government constructively amended the Indictment in more than one impermissible

way.  Thus, this Court has little confidence that Defendant was convicted of the same

offense for which the Grand Jury returned the Indictment.  Like in the United States

Supreme Court case of Stirone, 361 U.S. 212, 217 (1960) — where the Hobbs Act

indictment charged the unlawful importation of sand, the evidence presented at trial also

demonstrated exportation of steel (not charged in the indictment), and the court allowed the

jury to convict for either — here, the Government's case flip-flopped between theories of

international kidnapping based on events that, as a matter of law, could not constitute the

bases for the crime Defendant was actually charged with in the Indictment.

---

[18] Defendant contends that the Government "repeatedly referenced Poonamben's understanding of her parental rights in reference to the [May 2017 Custody Order], rather than the [October 2018 Return Order]. The [G]overnment told the jury that Poonamben agreed to allow the Defendant to take AAP on a 'short visit' to India in July 2017 but panicked when they had not returned within a month." [Dkt. No. 116, at 12.]

The Court now considers, in turn, the two impermissible theories of Defendant's culpability presented by the Government to the jury, each of which the Court finds constitutes a separate constructive amendment of the Indictment.  Due process requires the Court to vacate Defendant's conviction if even one constructive amendment of the Indictment occurred.

### A.    Constructive Amendment No. 1 – The July 2017 Removal of AAP by Defendant Did Not Constitute a Violation of Section 1204

The Government repeatedly argued to the jury that the Custody Agreement was a sham.  Indeed, much of Poonamben Patel's testimony focused on how she thought the agreement was an application for AAP's VISA to go to India for a short family trip with Defendant.  [Tr. at 216:24–217:4.]  The Government also highlighted that she does not speak English well, such that she did not understand the document she was signing.  [Tr. at 40:16–21.]  Next, the Government presented testimony that the May 2017 Custody Order was fraudulently obtained by Defendant, as well.  [Tr. at 40:2241:3.]  Much of the relevant testimony centered on what happened that day before the Family Court liaison.  [Tr. at 141:24142:2.]  Poonamben Patel testified she felt forced to go along with it and only answer questions from the Family Court as Defendant had instructed her.  [Tr. at 220:14221:1.]  To make matters worse, the Government even suggested to the jury that the Custody Agreement was <u>never</u> presented to the Family Court and was <u>not</u> what the Court's May 2017 Custody Order meant when it expressly referred to Poonamben Patel's parenting time "as agreed by the parties."[19]  [Govt. Ex. 1.]

_____

[19] By planting the seed in the jurors' minds that the Custody Agreement was not what the Court's May 2017 Custody Order referred to in defining Poonamben Patel's parenting time "as agreed by the parties," the Government was not only attacking the May 2017 Custody Order, but also asking the jury to usurp the role of the Family Court Judge in interpreting its

The Court incorporates its discussion of applicable New Jersey family law from its initial Opinion, dated February 18, 2022:

> Under New Jersey law, there are three ways to establish child custody: "[j]oint custody of a minor child to both parents," "[s]ole custody to one parent with appropriate parenting time for the noncustodial parent," and "[a]ny other custody arrangement as the court may determine to be in the best interests of the child." Bisbing v. Bisbing, 230 N.J. 309, 321, 166 A.3d 1155, 1161 (2017) (quoting N.J.S.A. 9:2–4(a), (b), (c)).

[Dkt. No. 42, at 1 n.1.]  Section 1204 also defines the term "parental rights" within the meaning of the statute:

> (b) As used in this section –
>
>> (1) the term "parental rights" . . . means the right to physical custody of the child -
>>
>>> (A) Whether joint or sole (and includes visiting rights); and
>>>
>>> (B) Whether arising by operation of law, court order, or legally binding agreement of the parties.

18 U.S.C. § 1204(b).  Thus, "parenting time" under New Jersey law and "visiting rights" for purposes of Section 1204 are synonymous; however, such rights must derive by/from "operation of the law, court order," or a "legally binding agreement of the parties." 18 U.S.C. § 1204(b)(2)(B).  New Jersey law has also codified the requirement that family courts "shall order any custody arrangement which is agreed to by both parents unless it is contrary to the best interests of the child."  N.J.S.A. § 9:2-4(d).

This Court instructed the jury that pursuant to New Jersey family law, "parents have equal rights to custody of their child by operation of law.  Thus, absent a court order or legally binding agreement, parents maintain joint custody of their child."  [Dkt. No. 111, at

_____

own order.  Stated differently, the Government put the jury in the shoes of the Family Court Judge to improperly decide the Patels' 2017 custody dispute.

31.] Finally, but also of critical importance here, the Second Circuit, in considering a similar

fact pattern involving a Section 1204 violation, discussed the validity of a custody order

issued by a state family court:

> it is a well-established 'basic proposition that all orders and judgments of courts must
> be complied with promptly' and that while a party has a right to appeal the order,
> 'absent a stay, he must comply promptly with the order pending appeal.'

United States v. Miller, 626 F.3d 682, 689 (2d Cir. 2010) (first quoting Maness v. Meyers,

419 U.S. 449, 458, (1975), then quoting McDonald v. Head Crim. Ct. Supervisor Officer,

850 F.2d 121, 124 (2d Cir.1988)).

Like in Miller, the Family Court here never issued a stay of its May 2017 Custody

Order, which undeniably awarded Defendant sole legal custody of AAP and parenting time

for Poonamben Patel "as agreed by the parties."  To put it simply, at a minimum, the May

2017 Custody Order was a legally valid order from the Family Court, granting Defendant

sole custody of AAP and limiting Poonamben Patel's custodial rights to parenting time "as

agreed by the parties."  In light of the testimony and arguments presented by the

Government attacking the validity of the May 2017 Custody Order and the Custody

Agreement, and despite this Court's best efforts to instruct the jury that the May 2017

Custody Order, however, was a valid state court order as a matter of law,[20] the Court finds

that no reasonable juror could have sat through the trial without questioning the validity of

either the Custody Agreement or the May 2017 Custody Order.  And although jurors are

presumed to follow the Court's instruction, it is unreasonable to presume that these

---

[20] The May 2017 Custody Order was a valid court order because it had never been modified
by the Family Court.  See N.J.S.A. 2a:34-58 (stating that when a state family court makes a
child custody determination, "the determination is conclusive as to all decided issues of law
and fact except to the extent the determination is modified").

"invalidity bells" could ever be unrung given the manner in which the Government presented its case.

The argument the Government presented to the jury is a textbook example of paralipsis.[21]   The Government never directly argued to the jury that the Custody Agreement or the May 2017 Custody Order were "legally invalid," as any such argument would have been obviously and diametrically opposed to this Court's own instructions to the jury:

> I instruct you, as a matter of law, that the [May 2017 Custody Order] altered the parents' joint custody rights. I instruct you further that as a matter of law, the [May 2017 Custody Order] is a valid court order that has not been appealed, has not been amended or changed by a later order, and no stay of the order was ever requested or issued.

[Dkt. No. 111, at 32.]  Yet, the Government refused to abandon its invalidity argument and decided to dress it up differently.  Since the Court precluded an argument that the May 2017 Custody Order was invalid, but still unwilling to concede that Defendant had sole legal custody of AAP during the relevant period, the Government then resorted to attacking both the Custody Agreement and the May 2017 Custody Order as ends achieved by Defendant through fraudulent means.  The Government placed recurrent emphasis on Poonamben Patel's alleged misunderstandings regarding the significance of the Custody Agreement and May 2017 Custody Order and suggested to the jury that she never intended the custody arrangement that resulted as a matter of law.  The Court finds such trial strategy was essentially a workaround to the Court's ruling that the May 2017 Custody Order was valid as a matter of law.  Thus, by the Government presenting evidence and argument that called

---

[21] "Paralipsis," defined by the Oxford English Dictionary is"[t]he rhetorical device of emphasizing or drawing attention to something by professing to say little or nothing about it, or affecting to dismiss it."  *Paralipsis*, <u>Oxford English Dictionary</u> (3d ed. 2005).

into question the validity of not only the Custody Agreement but also the May 2017
Custody Order, a jury, unable to unring these invalidity bells, may very well have concluded
that the custody of AAP should resort to joint custody for both parents "by operation of
law," the first prong of N.J.S.A. 9:2–4(a).

      Under such a theory, Defendant would have violated Section 1204 as soon as he left
for India.  In light of the Government's improper evidence and argument concerning
Defendant's "fraudulently obtained" sole legal custody of AAP, the Court is of the firm
view that the jury may well have convicted Defendant of a crime the Grand Jury never
returned against him in the Indictment.  The essential term in the Indictment was that
Defendant violated Section 1204 "from at least as early as October 19, 2018," **not as soon
as he left for India with sole legal custody of his son in May 2017**.  [Dkt. No. 5, at ¶ 4.]
The Government's improper argument and evidence significantly broadened the possible
bases for the jury's conviction.  Stated differently, the Government's improper argument
and evidence that the Custody Agreement and May 2017 Custody Order were fraudulently
obtained and therefore invalid as a matter of law constitutes an impermissible constructive
amendment of the Indictment.[22]  The legal significance of the May 2017 Custody Order was
not for the jury to decide in rendering a verdict in this criminal case.

    **B.**    **Constructive Amendment No. 2 – The August 2017 Retention of AAP by
Defendant Did Not Constitute a Violation of Section 1204**

      The Court finds that the Government constructively amended the Indictment, yet
again, by presenting a theory of its case to the jury that Defendant committed the offense at

---

[22] The Court queries whether the Government could ever properly secure a Section 1204
conviction in this case without impermissibly either attacking the validity of the Custody
Agreement and/or May 2017 Custody Order.  It seems it could not, but the Court leaves
this issue for another day.

another time not reasonably near October 19, 2018—the "charging date" in the Indictment. More specifically, the Government repeatedly argued to the jury that Defendant alternatively violated Section 1204 when he failed to return from India with AAP sometime in August 2017 — two weeks to a month after they left the country in late July 2017 — as he had promised Poonamben Patel.

The Court cautioned the Government throughout pre-trial proceedings that even if this theory of culpability were completely true, the Indictment did not charge Defendant with a kidnapping in August 2017. The Court initially opined that in the context of Section 1204, "visitation rights" or "parenting time" should be specifically defined to the extent derived from a court order or legally binding agreement. [Dkt. Nos. 42, 43.] The Court also reasoned that an "agreement to later agree" as to parenting time among parents, as occurred here, is insufficient as a matter of law, but afforded the Government an opportunity to respond. [Dkt. No. 42.] The Government's response was that a triable issue of fact concerned what Defendant and Poonamben Patel had mutually agreed to:

> The Family Court's May 2017 order granted parenting time as agreed by the parties. Poonamben's agreement was to allow the Defendant to take AAP to India for a short period of time and not permanently live there. Moreover, by failing to tell the Family Court of his real intention to relocate to India, the Defendant deprived the [Family] Court of its ability to determine the best interest of the child and what parenting time each parent was entitled to. The Defendant did that through fraud.[23]

[Dkt. No. 44, at 4 (emphasis added).]

Then, at oral argument on this same issue, the Court expressly asked the Government how the charging language in the Indictment was consistent with the

---

[23] This is precisely the argument Poonamben Patel should have made to the Family Court, not the Government. As the record reflects, Poonamben Patel appeared to return to Family Court after the court lost jurisdiction over the custody matter.

Government's new theory of culpability, reproduced in pertinent part below:

> GOVERNMENT: But -- so Your Honor is thinking that we actually -- so under Your Honor's theory, we could have actually charged it as of <u>August of 2017</u>.
>
> THE COURT: That's why I asked you, [. . .], when did the crime occur, and you said –
>
> GOVERNMENT: I did. But it's a continuing offense. It is a continuing offense.
>
> THE COURT: But that's not how you charged it.
>
> GOVERNMENT: I charged it from October of 2018 based on that order requiring him to return to New Jersey with the child.
>
> THE COURT: But don't you have -- isn't that a constructive amendment to the indictment now? <u>If you're going to argue to the jury that the crime occurred in July or August of 2017, doesn't the defendant have a right to know what crime he's being charged with? He's only being charged with failing to abide by the return order.</u>
>
> GOVERNMENT: Right. Because that is when we are saying he interfered with her parental rights. <u>From that time when he's ordered to return, that's the optimal date that we will argue to the jury.  What we're arguing to the jury is -- because I'm sure defense would say, look, this May 2017 order gave him custody. Our point would be that was done under a fraudulent pretense, and that was done under a pretext.</u> And so that –
>
> THE COURT: <u>But if you're seeking to undo a court order, the jury is not going to do that. There would be no way I would say to the jury was that order obtained under false pretenses such that it turns it into a kidnapping charge. That to me sounds like it's a family court dispute.</u> And her remedy was to go back before the state judge, undo the court order. Because if the jury is being asked to, in essence, undo the court order, I would never allow that.

[Dkt. No 56, at 13:10–14:17.]

At this point in the pre-trial proceedings, critically, the Court was satisfied that the Government had presented a triable issue of fact with respect to whether Poonamben Patel even had parental rights, as a matter of law, that Defendant could have intended to obstruct. In other words, the Court agreed that the issue for the jury to decide was what Defendant and Poonamben Patel had agreed to in terms of her parenting time (*e.g.*, would she see AAP once a week in New Jersey, once a month via Facetime or some other video conferencing service, etc.). However, the Court made very clear that this new theory may well be a constructive amendment of the Indictment:

> THE COURT: And, again, the difficulty is, is that there is no summary judgment vehicle for a court in a criminal case. Whether this case survives beyond a directed verdict, who knows. Whether or not, even if there is a verdict, it stands, who knows. Because – I sound like I'm repeating myself – I think this case smacks of all kinds of due process violations. And I don't know how to deal with it unless and until I hear the facts.
>
> And if, at the end of the day, the verdict is in favor of the defendant, then the jury has spoken. If it's [sic] in favor of the defendant and I throw the verdict out, then the Court has spoken.
>
> But at this point, the government has its theories of the case. <u>Whether there's a constructive amendment or not, I don't know, remains to be seen. And I guess I'll have to confront the issues as they come in.</u>

[*Id.* at 48:14–49:4 (emphasis added).] The Court previewed that it would modify its earlier Opinion and issued a Supplemental Opinion on May 31, 2022, reproduced in pertinent part below:

> This Court understands the prosecution to allege that when Defendant failed to return to the United States in August 2017, he interfered with Poonamben Patel's ability to have any parenting time with her child, in violation of 18 U.S.C. § 1204. Thus, the Government is not alleging that a custody order was violated, but that Defendant, by not returning to the United States when Poonamben Patel expected, obstructed her from having any parenting time. This theory, as narrowed by the Government, appears to fall within the parameters of [Section] 1204.

[Dkt. No. 62, at 1–2.] Consistent with the Court's reasoning at oral argument, the Court

made no findings in its Supplemental Opinion regarding whether this new theory

constructively amended the Indictment.[24]

Unsurprisingly, the jury heard the argument that Defendant committed the crime in

August 2017 throughout trial, including during the Government's summation:

> GOVERNMENT: The issue, ladies and gentlemen, that you have to decide is
> mutually agreed upon by the parties. Look at all of the facts and circumstances. That
> mutual agreement was that the [D]efendant was taking AAP to India for up to a
> month.

[Dkt. No. 109, at 712:3–7.]  But again, the Indictment did not charge Defendant with a

kidnapping in August 2017 when he stayed in India with his son.  The first prong of the

Indictment set forth important background information, including Defendant's and AAP's

birthdays and status as U.S. citizens, as well as information about Poonamben Patel.  [Dkt

5.]  Prongs 2 and 3 set forth additional background information:

> 2.   On or about July 26, 2017, defendant AMITKUMAR KANUBHAI
> PATEL and AAP boarded Qatar Airways Flight #702 from John F. Kennedy
> International airport in New York to Doha International airport in Doha,
> Qatar.
>
> 3.  On or about October 16, 2018, the New Jersey Superior Court
> Chancery Division Family Part ordered defendant AMITKUMAR
> KANUBHAI PATEL to return AAP to the United States immediately.

[*Id.*] Then, the charging language in Prong 4:

> 4. From at least as early as October 19, 2018 to the date of this
> Indictment, in the District of New Jersey and elsewhere, defendant

---

[24] During pre-trial proceedings, Defendant moved to dismiss the Indictment pursuant to
Fed. R. Crim. P. 12(b)(3)(B)(v) for failure to state an offense.  As the Court discussed in its
initial Opinion, Rule 12 "encourages district courts to entertain and dispose of pretrial
criminal motions if they are capable of determination without trial of the general issues."
[Dkt. No. 42, at 13 (citing United States v. Levin, 973 F.2d 463, 467 (6th Cir. 1992)).]
Notwithstanding the constructive amendment issue, whether the evidence supported a
conviction as stated in the Indictment remained hotly disputed among the parties.  Thus, the
Court permitted the case to proceed to trial.

AMITKUMAR KANUBHAI PATEL

did knowingly. . .

[*Id.*] The Indictment was filed with the Court on July 22, 2020. [*Id.*]

The Court acknowledges that one interpretation of the phrase "from at least as early as" means that the crime could have occurred earlier than October 19, 2018. At the same time, the Court does not agree that by including the language "from at least as early as" in the Indictment, the Government can decide to supersede the charging date with any earlier date it chooses. Unfortunately, this is exactly what happened at trial notwithstanding continued admonishments from this Court.

In <u>Real v. Shannon</u>, the Third Circuit addressed this same line-drawing issue when considering similarly imprecise charging language in an indictment, agreeing with the Second, Fifth, Sixth, and Eleventh Circuit Courts of Appeals that "[w]here 'on or about' language is used, the government is not required to prove the exact dates, if a date **reasonably near** is established." <u>Real v. Shannon</u>, 600 F.3d 302, 308 (3d Cir. 2010) (emphasis added) (citing <u>United States v. Nersesian</u>, 824 F.2d 1294, 1323 (2d Cir.1987); <u>United States v. Benson</u>, 591 F.3d 491, 497 (6th Cir.2010); <u>United States v. Mata</u>, 491 F.3d 237, 243 (5th Cir.2007); <u>United States v. Reed</u>, 887 F.2d 1398, 1403 (11th Cir.1989); <u>United States v. Leibowitz</u>, 857 F.2d 373, 379 (7th Cir.1988)). In <u>Shannon</u>, the Circuit went on to find that an offense committed within a month of the date charged satisfied the "reasonably near" requirement. <u>Id.</u> Here, the date charged in the Indictment is October 19, 2018, almost fourteen months after Defendant remained in India with his son in August 2017. Although the Government was permitted to argue a reasonably near, earlier offense date than

43

October 19, 2018, the Court now finds, as expected, that the argument at trial that Defendant violated Section 1204 when he remained in India in August 2017 constitutes a constructive amendment of the Indictment.

The Third Circuit has further instructed that a crucial consideration in this context is whether Defendant was "so surprised by the proof adduced that he was unable to prepare his defense adequately."  United States v. Somers, 496 F.2d 723, 746 (3d Cir. 1974).  The Court is persuaded by Defendant's argument that given the Government's ever-changing theory of its case, his defense of the case became akin to defending a moving target, such that he did not have an adequate opportunity to prepare a meaningful defense.  Specifically, Defendant could not have known that the Government would continue to press the argument that as of August 2017, Defendant became guilty of kidnapping merely by remaining in India, when the Indictment listed the beginning date of the offense as "at least as early as" October 19, 2018, three days after the October 2018 Return Order was signed.  A difference of fourteen months is not reasonably close.

Given the complex facts of this case, including the intertwined custody proceedings that ensued in Family Court, dates are especially critical in the context of this case and in consideration of Defendant's due process rights as guaranteed by the Fifth Amendment.  No matter how imprecisely the charging language in an Indictment may be crafted, due process requires the Government to prove the offense occurred reasonably near the date it charged.  The Government's argument that the crime occurred in August 2017 was another attempt to mislead the jury and emphasize certain events that did not prove the crime charged.  There are obvious

due process limitations to imprecise charging language like "from at least as early

as," and the Government must prove that the charge occurred reasonably near the

charging date of the Indictment.  The Government's theory that the offense began in

August 2017 constitutes another constructive amendment of the Indictment.

## II.     The Government Engaged in Conduct that was Unfairly Prejudicial to the Defendant

Defendant further presses to vacate the conviction because of prosecutorial

misconduct.  To be certain, the Government presented arguments to the jury that were not

only erroneous, but also infringed upon Defendant's constitutional rights to due process.

The Third Circuit has instructed that this constitutional error infects trial proceedings "when

the impact of the misconduct is **distract the trier of fact** and thus raise doubts as to the

fairness of the trial."  United States v. Morena, 547 F.3d 191, 193–94 (3d Cir. 2008)

(quoting Marshall v. Hendricks, 307 F.3d 36, 67 (3d Cir.2002) (emphasis added)).  "The test

for prosecutorial misconduct is whether the conduct 'so infected the trial with unfairness as

to make the resulting conviction a denial of due process' in light of the entire proceeding".

Id. at 194 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, (1974)).  In considering

the prejudicial effect of any misconduct or erroneous legal argument made by the

Government at trial, this Court should assess the Government's "improper actions, the

weight of properly admitted evidence[,] and any curative instructions given by the trial

court."  Id. (citing Moore v. Morton, 255 F.3d 95, 112–113 (3d Cir.2001)).

In Morena, a felon was charged with the possession of a firearm, but the prosecution

contended that some background information about why he even had the firearm—to

protect a drug dealing enterprise—was necessary for context.  Morena, 546 F.3d at 194.

However, on appeal the Third Circuit found that the prosecution overstepped by

"systematically injecting inadmissible drug evidence into the two-day trial." Id.  It was

notable that at least five times during trial the district court declared that the prosecutor's

evidence of drug dealing was too prejudicial in light of the offense actually charged.  Id.

The Third Circuit also confirmed that the "government's evidence was not sufficient to

overcome the prejudice resulting from the prosecutor's misconduct." Id. at 196.

Importantly, the Circuit found the trial court's single limiting instruction — reminding the

jury that the defendant was accused of posing a firearm and "not any drug charges" — was

insufficient to overcome "the government's systematic presentation of prejudicial drug

evidence constituted misconduct in violation of due process." Id. at 197.  Ultimately, the

Circuit in Morena reversed and remanded for a new trial.  Id. at 199.  Here, the Court has

similar concerns and finds that Morena provides a close analogy to how the Government

presented its case at trial.

### A.     The Government Erroneously Argued that the October 2018 Return Order Altered the Patel Custody Arrangement

Throughout the pre-trial proceedings, Defendant persistently sought to have the jury

hear that the Family Court was without jurisdiction to modify the Patel custody

arrangement.  The Court time and time again denied Defendant's request because in the

Court's view the October 2018 Return Order **only** directed Defendant to appear and did **not**

change the parents' custody status.  In other words, the October 2018 Return Order was a

means for the Family Court to **later** determine, at the appropriate time, whether it even had

jurisdiction, or not, to entertain Poonamben Patel's motion to modify custody.  Period.

Yet, the Government went too far, misrepresenting the meaning of the October 2018 Return

Order as granting Poonamben Patel custody of AAP.[25]  First, the Government presented evidence, through Poonamben Patel and her attorney, that in July of 2018, Poonamben Patel filed a motion in Family Court and sought to modify the May 2017 Custody Order. From there, the Government plainly erred in presenting evidence that the Family Court had actually granted Poonamben Patel's request to modify custody.

Through the testimony of Poonamben Patel's attorney, the Government introduced a **legal misstatement of not only the law, but the facts**.  As noted earlier, Government Exhibit 12 was a copy of the letter Poonamben Patel's attorney sent to Defendant on January 30, 2019, enclosing the Return Order.  It provided:

> I write to advise you that on October 16, 2018 the **Superior Court of New Jersey ordered that Poonamben Patel be granted custody of [AAP]**. (Attached please find the order)  Additionally, the court also ordered that the child be returned to the United States his country of nationality.  As such, we are once again informing you as to the Court's decision and that you must return [AAP] to the United States immediately.

[Gov't. Ex. 12; Tr. 100-01. (emphasis added).]

The admission of Government Ex. 12 constituted a fundamental miscarriage of justice.  As a matter of law, the October 2018 Return Order did **not** grant Poonamben Patel custody of AAP.  Poonamben Patel's lawyer's statement was erroneously made, and the Government should not have introduced it.  The Government compounded this error in two

---

[25] To make matters worse, the Government sought to introduce evidence that by an order dated March 24, 2021, the Family Court granted custody of AAP to Poonamben Patel. [Gov't Ex. 4.] The Court also precluded the admission of such evidence. First, it was clearly prejudicial to Defendant who was sitting in a London prison at the time the order was entered. Second, it is clear to this Court that at some point the Family Court lost jurisdiction to hear the custody matter because AAP resided in India—and had since the conclusion of the Hague proceedings—and Poonamben Patel testified that she lived on Commons Lane in Saugerties, New York.  [Tr. 148:11; see also N.J.S.A. § 2A:34-65 (Child Custody Jurisdiction).]

significant respects.  First, it presented evidence to the jury that the Return Order was still in effect at the time of trial.  Second, the Government opposed the introduction of testimony from the defense's matrimonial law expert who would have testified that the October 2018 Return Order was not valid because Defendant had not been given prior notice, the Family Court lacked jurisdiction to enter the order, and the October 2018 Return Order, substantively, did not grant custody to Poonamben Patel.[26]  Believing that it could instruct the jury as to the applicable family laws of New Jersey, the Court denied Defendant's request to introduce the matrimonial expert's testimony.  However, the Court did not consider that the Government would repeatedly misstate the applicable state family law to the jury.

### B.   The Government Improperly Argued that the Offense Continues "To This Day"

As noted earlier, the Government also continued to press upon the jury that Defendant's Section 1204 offense continues "to this day," that is, Defendant has failed to return AAP to the United States.  [See e.g., Tr. at 101]. Such argument was remarkable in light of the Hague Court's order that AAP be returned to India to be with his father, the Defendant, not with his mother in the United States.  [Dkt. No. 21-5.]  As a consequence of the Hague Court ruling, the Government could no longer prove an "intent to obstruct," an essential element of a Section 1204 offense.[27]  This was clearly an impermissible – indeed

---

[26] The Court could go on.  The fact that the Government also introduced the December 2019 Order [Govt. Ex. 7] could also have served as a basis for the jury's conviction.  This fact was never the subject in any pre-trial motions, and certainly Defendant was unaware of this charge given the manner in which the Indictment was written, limiting the charge to the failure to comply with the October 2018 Return Order.

[27] It seems that the Government would accept nothing less than Poonamben Patel having her custody dispute decided in the United States, if not by the state court with original jurisdiction over the custody dispute, without consideration of whether that jurisdiction had

prejudicial – argument to suggest to the jury that the crime of kidnapping continues to the date of the trial, not only because of the ruling of the Hague Court, but also because the Grand Jury clearly did not return the Indictment on this set of facts.  Because the jury may have convicted Defendant based upon this set of facts, the Government injected fatal error into the trial.

### C.    The Weight of the Properly Admitted Evidence

Defendant also argues that the Court should enter a judgment of acquittal because Poonamben Patel was unworthy of belief.  Clearly there were obvious inconsistencies with her testimony.  Indeed, the Hague Court explicitly found that she had deliberately lied throughout the proceeding to help her immigration status.  However, because the Government impermissibly constructively amended the Indictment, this argument cannot be evaluated in proper context and the Court does not address it at this time.

### D.    The Court's Curative Instruction Was Insufficient

Finally, the Government contends that there was no error as the jury was properly charged as to the law and the jury applied the law to the facts.  This Court's instructions to the jury, however, could not undo all of the damage done.[28]  Defendant is correct:  no

---

been lost or the Hague Court ruling should be given full faith and credit.  Cf. Thompson v. Thompson, 484 U.S. 174, 181–82 (1988) (finding Congress' reaction, in enacting the Parental Kidnapping Prevention Act of 1979, to the nationwide problem of "child snatching" as a method of forum shopping for custody orders by noncustodial parents "was to extend the requirements of the Full Faith and Credit Clause to custody determinations[,]" and further noting that "Congress did not intend the federal courts to play the enforcement role that petitioner urges.").

[28] The Court instructed, in pertinent part, as follows:

> To the extent you heard evidence that the [May 2017 Custody Order] was not valid, you disregard such evidence and follow my instruction that as a matter of law, the [May 2017 Custody Order] is a valid court order.  Moreover, the extent you heard evidence that the October 2018 Return Order altered the

matter how much this Court tried to "undo the damage" with its jury instructions, it was too late.  Like in <u>Morena</u>, the Court does not feel that a single curative instruction could address the continued and systematic injection of improper legal argument by the Government at trial.  Indeed, it is not an understatement to say that the evidence and the Court's extensive jury charges as to the elements of Section 1204 almost seemed to rewrite the Government's case.  A court should never be left with such unsettledness.

## <u>CONCLUSION</u>

In the end, this Court has the firm conviction that a miscarriage of justice occurred. The Government made legal and factual misrepresentations to the jury that infringed upon Defendant's constitutional rights to due process.  Two of the Government's arguments went so far as to constructively amend the Indictment.  First, the Government improperly argued that a violation of Section 1204 occurred upon Defendant's removal of AAP from the United States in July 2017 because the May 2017 Custody Order was procured by fraud. However, the May 2017 Custody Order, granting Defendant sole legal custody of AAP, was a valid order of the Family Court as a matter of law.  Second, the charging date of the Indictment was October 19, 2018, such that the Government's argument that Defendant's

---

May 2017 Custody Order Order is valid.  The [October 2018 Return Order] did not alter the [May 2017 Custody Order], you must disregard such evidence and follow my instruction that the [May 2017 Custody Order] is valid.  The [October 2018 Return Order] did not alter the [May 2017 Custody Order], and on its own did not alter or create parental rights within the meaning of the statute with respect to either parent's custody rights in this case.  To the extent you heard any evidence or argument that the defendant violated this statute by failing to abide by the [October 2018 Return Order], that is the order to return AAP to the United States, I instruct you that as a matter of law a failure to obey a court order in and of itself does not constitute a violation of this statute.

[Dkt. No. 111, at 32.]

retention of AAP in India, fourteen months earlier in August 2017, also constituted a constructive amendment of the Indictment.  The Government pressed additional misrepresentations at trial that were unfairly prejudicial to Defendant, including that the October 2018 Return Order granted Poonamben Patel custody of AAP.  This was a blatant misstatement of the law.  Finally, it was clearly prejudicial for the Government to argue that the offense continues "to this day," a set of facts the Grand Jury clearly never considered. For these reasons set forth above, the Court will vacate Defendant's conviction for a new trial.  An accompanying Order, of today's date, shall issue.

Date:  <u>November 29, 2022</u>          <u>s/Renée Marie Bumb</u>
                              Renée Marie Bumb
                              U.S. District Judge